*Canton Harbor Healthcare Center, Inc. v. Felicia Robinson, et al.*, No. 22, September Term, 2024. Opinion by Biran, J.

**HEALTH CARE MALPRACTICE CLAIMS ACT – CERTIFICATE OF A QUALIFIED EXPERT SUBMITTED BY A REGISTERED NURSE – PROXIMATE CAUSE – PRESSURE ULCERS –** Under the Health Care Malpractice Claims Act (the "HCMCA" or the "Act"), unless the sole issue in a claim is lack of informed consent, a claimant must file a "certificate of a qualified expert … attesting to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury[.]" Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 3-2A-04(b)(1)(i)1 (1974, 2020 Repl. Vol.). A plurality of the Supreme Court of Maryland held that, where a patient was previously diagnosed as having developed a pressure ulcer at a skilled nursing facility, a registered nurse may be qualified to attest in a certificate that a breach of the applicable standards of nursing care at the facility proximately caused the pressure ulcer. A registered nurse who relies on a pre-existing diagnosis does not make a diagnosis concerning the injury itself in a certificate filed under the HCMCA. Rather, the nurse accepts the accuracy of the pre-existing diagnosis made by another health care provider(s). A registered nurse does not exceed the bounds of nursing practice when the nurse opines in a certificate that a departure from the standards of nursing care is the proximate cause of a previously diagnosed pressure ulcer that developed while the patient resided at a skilled nursing facility.

**HEALTH CARE MALPRACTICE CLAIMS ACT – CERTIFICATE OF A QUALIFIED EXPERT SUBMITTED BY A REGISTERED NURSE – PEER-TO-PEER REQUIREMENT –** The HCMCA contains a peer-to-peer requirement with respect to a "health care provider" who signs a certificate of a qualified expert: such a "health care provider … [s]hall have had clinical experience, provided consultation relating to clinical practice, or taught medicine in the defendant's specialty or a related field of health care, or in the field of health care in which the defendant provided care or treatment to the plaintiff, within 5 years of the date of the alleged act or omission giving rise to the cause of action[.]" CJP § 3-2A-02(c)(2)(ii)1A. A registered nurse is included in the HCMCA's definition of a "health care provider." *Id.* § 3-2A-01(f)(1). The Supreme Court of Maryland held that a registered nurse meets the HCMCA's peer-to-peer requirement to the extent the nurse attests to alleged breaches of standards of nursing care. A nurse does not meet the peer-to-peer requirement to the extent the nurse attests to the standard of care applicable to a physician and to a physician's alleged departure from that standard of care.

Circuit Court for Baltimore City
Case No.: 24-C-22-001200 MM
Argued: January 7, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 22

September Term, 2024

---

CANTON HARBOR HEALTHCARE
CENTER, INC.

v.

FELICIA ROBINSON, ET AL.

---

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

---

Opinion by Biran, J.
Watts, J., concurs.
Booth, Eaves, and Killough, JJ.,
concur and dissent.

---

Filed: July 29, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Under Maryland's Health Care Malpractice Claims Act, a person who has a claim against a health care provider for damage due to a medical injury must go through an arbitration process. As part of that process, unless the sole issue in the claim is lack of informed consent, the claimant must file a "certificate of a qualified expert … attesting to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury[.]" Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 3-2A-04(b)(1)(i)1 (1974, 2020 Repl. Vol.). In this case, we consider whether a registered nurse may be qualified to attest to these matters in a claim against a skilled nursing facility for negligently allowing a patient to develop pressure ulcers.

After receiving treatment for a stroke, Everett Robinson was transferred to Canton Harbor Healthcare Center, Inc. d/b/a FutureCare-Canton Harbor ("Canton Harbor"), for inpatient follow-up care. Canton Harbor is a skilled nursing facility. During his stay at Canton Harbor, Mr. Robinson developed pressure ulcers, also known as decubitus ulcers or, in more common parlance, bedsores. Mr. Robinson was transferred to other facilities, where his pressure ulcers allegedly worsened. Mr. Robinson subsequently passed away.

Mr. Robinson's widow, Felicia Robinson, along with Mr. Robinson's surviving children (collectively, the "Robinsons") filed a Complaint in the Circuit Court for Baltimore City against Canton Harbor. The Robinsons alleged that Canton Harbor's negligence allowed Mr. Robinson's pressure ulcers to develop, spread, and become infected, and that Canton Harbor's negligence caused Mr. Robinson's wrongful death. During the arbitration process that preceded the filing of their Complaint in the circuit court, the Robinsons filed a certificate of qualified expert signed by Anjanette Jones-Singh,

a registered nurse (the "Jones-Singh Certificate" or the "Certificate"). In the Certificate, Nurse Jones-Singh attested that Canton Harbor "breached the standard of care and the breach was the proximate cause of … the development of [Mr. Robinson's] pressure ulcers." A report written by Nurse Jones-Singh was attached to and incorporated into the Certificate. In her report, Nurse Jones-Singh provided more information concerning what she described as the applicable standard of care, how Canton Harbor's staff breached that standard of care, and how those breaches caused Mr. Robinson's pressure ulcers.

The circuit court granted Canton Harbor's motion to dismiss the Complaint on the ground that, as a registered nurse, Nurse Jones-Singh is not qualified to attest to the proximate cause of Mr. Robinson's pressure ulcers. The Robinsons appealed. The Appellate Court of Maryland held that, in negligence cases alleging breach of nursing standards for preventing and treating pressure ulcers, a registered nurse is not disqualified *per se* to attest that failure to adhere to such standards proximately caused the plaintiff's injuries. *Robinson v. Canton Harbor Healthcare Ctr., Inc.*, 261 Md. App. 560, 588 (2024). The Appellate Court vacated the order of dismissal and remanded the case to the circuit court for further proceedings.

We affirm the judgment of the Appellate Court.[1]

---

[1] Chief Justice Fader, Justice Watts, Justice Biran, and Justice Gould concur in the mandate set forth at the conclusion of this opinion. Chief Justice Fader, Justice Biran, and Justice Gould join this plurality opinion in full. Justice Watts has filed a separate concurring opinion. Justice Booth, Justice Eaves, and Justice Killough would reverse the judgment of the Appellate Court, for the reasons stated in a concurring and dissenting opinion authored by Justice Booth.

# I

## Background

### A. The Health Care Malpractice Claims Act

The Health Care Malpractice Claims Act (the "HCMCA" or the "Act"), CJP §§ 3-2A-01 through 3-2A-10, "was enacted … as part of Maryland's answer to what was deemed to be the malpractice insurance crisis." *Bovey v. Exec. Dir., Health Claims Arb. Off.*, 292 Md. 640, 641 (1982). "The purpose of the Act is to screen malpractice claims, ferret out meritless ones, and, in theory, thereby lower the cost of malpractice insurance and the overall costs of health care." *Adler v. Hyman*, 334 Md. 568, 575 (1994).

To accomplish this purpose, the Act established the Health Care Alternative Dispute Resolution Office (the "HCADRO") as a unit in the Executive Department headed by a Director (the "Director") appointed by the Governor and confirmed by the Senate. CJP § 3-2A-03(a). Any person "having a claim against a health care provider for damage due to a medical injury" must initially file the claim with the Director and proceed with an arbitration process. *See id.* § 3-2A-04(a)(1)(i). Under the Act, "[h]ealth care provider" means:

> a hospital, a related institution as defined in § 19-301 of the Health – General Article, a medical day care center, a hospice care program, an assisted living program, a freestanding ambulatory care facility as defined in § 19-3B-01 of the Health – General Article, a physician, a physician assistant, an osteopath, an optometrist, a chiropractor, a registered or licensed practical nurse, a dentist, a podiatrist, a psychologist, a licensed certified social worker-

3

clinical, and a physical therapist, licensed or authorized to provide one or more health care services in Maryland.

*Id.* § 3-2A-01(f)(1). "Medical injury" means "injury arising or resulting from the rendering or failure to render health care." *Id.* § 3-2A-01(g).

After a claim against a health care provider is filed with the Director, the Director must cause a copy of the claim to be served upon the health care provider. *Id.* § 3-2A-04(a)(1)(ii). The health care provider must then file a response with the Director and serve a copy on the claimant and on all other health care providers named in the response. *Id.* § 3-2A-04(a)(1)(iii).

Unless the sole issue in the claim is lack of informed consent, the claimant[2] must file a "certificate of a qualified expert with the Director attesting to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury, within 90 days from the date of the complaint[.]" *Id.* § 3-2A-04(b)(1)(i)1. A "report of the attesting expert" must be attached to the certificate. *Id.* § 3-2A-04(b)(3)(i). If a claimant fails to file the required certificate, the claim "shall be

_____

[2] The Act requires a "claimant or plaintiff" to file a certificate of a qualified expert. CJP § 3-2A-04(b)(1)(i)1. After going through the arbitration process and filing a claim in court, a plaintiff in some circumstances must file another certificate of a qualified expert. *See id.* § 3-2A-06B(g) ("After the filing of an election to waive arbitration under this section, if a party joins an additional health care provider as a defendant in an action, the party shall file a certificate of qualified expert required by § 3-2A-04(b) of this subtitle with respect to the additional health care provider."); *Retina Grp. of Washington, P.C. v. Crosetto*, 237 Md. App. 150, 171-72 (2018) ("The Act specifically provides a vehicle by which a defendant who was not named in the arbitration proceeding may be joined, and that procedure requires that the plaintiff file a certificate identifying the new defendant and specifying the applicable standard of care and that the defendant breached it, causing the plaintiff's injuries."). For convenience, we refer only to a "claimant" when describing the provisions of the Act that relate to the certificate.

4

dismissed, without prejudice[.]" *Id.* § 3-2A-04(b)(1)(i)1. In lieu of dismissing the claim or action, the chairman of the arbitration panel or the court "shall grant an extension of no more than 90 days for filing the certificate" if "[t]he limitations period applicable to the claim or action has expired" and "[t]he failure to file the certificate was neither willful nor the result of gross negligence." *Id.* § 3-2A-04(b)(1)(ii).

A claim may be adjudicated in favor of the claimant on the issue of liability "if the defendant disputes liability and fails to file a certificate of a qualified expert attesting to compliance with standards of care, or that the departure from standards of care is not the proximate cause of the alleged injury," within 120 days of being served with the claimant's certificate. *Id.* § 3-2A-04(b)(2)(i). Like the claimant's certificate, a defendant's certificate must attach a report of the attesting expert. *Id.* § 3-2A-04(b)(3)(i). "Discovery is available as to the basis of the certificate" submitted both by the claimant and the defendant. *Id.* § 3-2A-04(b)(3)(ii).

A "health care provider who attests in a certificate of a qualified expert … may not have devoted more than 25% of the expert's professional activities[3] to activities that directly involve testimony in personal injury claims during the 12 months immediately before the date when the claim was first filed." *Id.* § 3-2A-04(b)(4)(ii).[4] Once a health care provider meets this requirement (commonly referred to as the "25 percent rule"), "the

---

[3] "[P]rofessional activities" means "all activities arising from or related to the health care profession." CJP § 3-2A-04(b)(4)(i).

[4] This requirement is also applicable to a health care provider who testifies in relation to a proceeding before an arbitration panel or a court concerning compliance with or departure from standards of care. CJP § 3-2A-04(b)(4)(ii).

health care provider shall be deemed to be a qualified expert" for the purpose of the 25 percent rule "during the pendency of the claim." *Id.* § 3-2A-04(b)(4)(iii).

In addition, the HCMCA effectively requires a peer-to-peer relationship between the defendant and the attesting expert:

> In addition to any other qualifications, a health care provider who attests in a certificate of a qualified expert … concerning a defendant's compliance with or departure from standards of care [s]hall have had clinical experience, provided consultation relating to clinical practice, or taught medicine in the defendant's specialty or a related field of health care, or in the field of health care in which the defendant provided care or treatment to the plaintiff, within 5 years of the date of the alleged act or omission giving rise to the cause of action[.]

*Id.* § 3-2A-02(c)(2)(ii)1.[5] If the defendant is board certified in a specialty, the attesting health care provider must be board certified in the same or a related specialty as the defendant. *Id.* § 3-2A-02(c)(2)(ii)1B.[6]

A party may not serve as a party's certificate expert, and the certificate may not be signed by a party, an employee or partner of a party, or an employee or stockholder of any professional corporation of which the party is a stockholder. *Id.* § 3-2A-04(b)(7).

After the exchange of certificates, the Director and the parties engage in statutorily defined steps to select an arbitration panel. *See id.* § 3-2A-04(c) through (e). At any time

---

[5] Like the 25 percent rule, this peer-to-peer requirement is also applicable to a health care provider who testifies in relation to a proceeding before an arbitration panel or a court concerning compliance with or departure from standards of care. CJP § 3-2A-04(c)(2)(ii)1.

[6] The board certification requirement does not apply if either: (1) the defendant was providing care or treatment to the plaintiff unrelated to the area in which the defendant is board certified, CJP § 3-2A-02(c)(2)(ii)2A; or (2) the health care provider taught medicine in the defendant's specialty or a related field of health care. *Id.* § 3-2A-02(c)(2)(ii)2B.

before the hearing of a claim with the HCADRO, the parties may agree mutually to waive arbitration of the claim. *Id.* § 3-2A-06A(a). Arbitration may also be waived by the claimant or any defendant unilaterally after the claimant has filed their certificate. *Id.* § 3-2A-06B(a) through (c).

Whether arbitration is waived mutually or unilaterally, within 60 days of the election to waive arbitration, the plaintiff must file a complaint with the appropriate circuit court or United States District Court. *Id.* §§ 3-2A-06A(c)(1) & 3-2A-06B(f)(1). No later than 15 days after the date that discovery in the lawsuit is required to be completed,

> a party shall file with the court a supplemental certificate of a qualified expert, for each defendant, that attests to:
>
> (i) The certifying expert's basis for alleging what is the specific standard of care;
>
> (ii) The certifying expert's qualifications to testify to the specific standard of care;
>
> (iii) The specific standard of care;
>
> (iv) For the plaintiff:
>
>> 1. The specific injury complained of;
>>
>> 2. How the specific standard of care was breached;
>>
>> 3. What specifically the defendant should have done to meet the specific standard of care; and
>>
>> 4. The inference that the breach of the standard of care proximately caused the plaintiff's injury; and
>
> (v) For the defendant:
>
>> 1. How the defendant complied with the specific standard of care;
>>
>> 2. What the defendant did to meet the specific standard of care; and

3. If applicable, that the breach of the standard of care did not proximately cause the plaintiff's injury.

*Id.* § 3-2A-06D(b)(1). In addition, "[t]he facts required to be included in the supplemental certificate of a qualified expert shall be considered necessary to show entitlement to relief sought by a plaintiff or to raise a defense by a defendant." *Id.* § 3-2A-06D(b)(3). As is the case with respect to an initial certificate, a party may not serve as a party's supplemental certifying expert, and the supplemental certificate may not be signed by a party, an employee or partner of a party, or an employee or stockholder of any professional corporation of which the party is a stockholder. *Id.* § 3-2A-06D(e).

## B. Mr. Robinson's Stay at Canton Harbor

According to the Complaint that the Robinsons filed in the circuit court, Mr. Robinson "came under the treatment and care of [Canton Harbor] after being transferred from Johns Hopkins Hospital for follow up care due to a stroke." The Complaint further alleged that Mr. Robinson "developed left leg ulcers which were brought to the attention of the facility … which should have been properly treated and care[d] for." However, according to the Complaint, Mr. Robinson's "bedsores" were allowed to develop and spread, and the "areas became infected." Mr. Robinson allegedly was transferred from Canton Harbor and received further treatment and care for his condition at other facilities. However, the Complaint alleges, Mr. Robinson's condition worsened, and he became septic and died.

### C. The Jones-Singh Certificate and Attached Report

The Robinsons filed a claim against Canton Harbor with the Director, which was assigned case number 2021-145. On September 10, 2021, the Robinsons filed the Jones-Singh Certificate in the HCADRO. In the Certificate, Nurse Jones-Singh attested that she is "familiar with and knowledgeable of the standards of care applicable to the treatment and care of an individual under the circumstances of the treatment and care as provided to [Mr.] Robinson in this matter." Nurse Jones-Singh further attested that she had reviewed "the pertinent medical records pertaining to [Mr. Robinson's] treatment and care" and, that in her opinion "to a reasonable degree of medical certainty,"[7] Canton Harbor "breached the standard of care and the breach was the proximate cause of Mr. Robinson's injuries," i.e., "the development of his pressure ulcers." Nurse Jones-Singh further stated that she incorporated into the Certificate her report dated September 7, 2021 (the "Report").

The 19-page Report opened with an overview of Mr. Robinson's experience at Canton Harbor, which began with Mr. Robinson's admission on August 16, 2018, and ended with his discharge from the facility on January 5, 2019. Nurse Jones-Singh stated that when Mr. Robinson was admitted to Canton Harbor, he was "completely dependent for care and was unable to communicate effectively." He was unable to move independently and relied on staff "to turn and reposition him, assist him with ADL care,[8]

---

[7] As discussed below, attesting experts need not assert in their certificates that they hold their opinions to a reasonable degree of certainty or probability. *See Kearney v. Berger*, 416 Md. 628, 652-53 (2010).

[8] Nurse Jones-Singh did not say in the Report what "ADL care" refers to. We understand that ADL is an acronym for "activities of daily living," which are defined as

provide him with nutrition, and anticipate his needs." According to the Report, during his stay at Canton Harbor, Mr. Robinson "developed pressure ulcers to his right buttock and left buttock, which were then merged into a sacral ulcer."

The Report then listed the records that Nurse Jones-Singh reviewed,[9] Mr. Robinson's admitting medical diagnoses,[10] and the medications ordered for Mr. Robinson upon admission to Canton Harbor. Nurse Jones-Singh noted that Mr. Robinson "was not started on Eliquis until September 11, 2018, nearly a month after being admitted at … Canton Harbor[.]" Nurse Jones-Singh further stated that the delay in ordering Eliquis, an anti-coagulant, "led to a decrease in Mr. Robinson's tissue perfusion," which she linked to his subsequent development of arterial ulcers at a different facility.

The Report then chronicled Mr. Robinson's experience at Canton Harbor from his initial assessment to developing pressure ulcers. Nurse Jones-Singh averred that Mr. Robinson was admitted without pressure ulcers, according to the initial assessment

---

"basic routine tasks that most healthy individuals can perform without assistance. These activities include personal care tasks such as eating, dressing, bathing, toileting, managing continence, and transferring (moving from 1 position to another)." Peter F. Edemekong, Deb L. Bomgaars, Sukesh Sukumaran, and Caroline Schoo, *Activities of Daily Living*, National Center for Biotechnology Information, available at https://perma.cc/64GE-FME3.

[9] These records included an admission assessment, subsequent skin assessments, nutritional assessment, "MDS" (which stands for "Minimum Data Set"), care plans, physician's progress notes, nurse practitioner's progress notes, and wound evaluations.

[10] These admitting diagnoses included, among other things, acute embolism, acute laryngotracheitis, altered mental status, aphasia (difficulty speaking), atherosclerotic heart disease, cerebral infarction, cerebrovascular disease, dysphagia (difficulty swallowing), hypertension, hemiplegia (paralysis to one side of the body), hyperlipidemia, seizures, and tachycardia.

conducted by Tracey Tralany, a registered nurse, but was determined to be at high risk of developing pressure ulcers per the "initial Braden scale" score of 11. Based on this Braden scale result, Canton Harbor implemented several orders: float heels; turn and reposition; barrier cream; pressure reducing mattress; and pressure reducing cushion. Subsequent Braden scale assessments on August 28, 2018, and September 11, 2018, placed Mr. Robinson at high risk and then very high risk for developing pressure ulcers, but Mr. Robinson had already developed both a right buttock ulcer and a left buttock ulcer by August 20, 2018 – four days after his admission to Canton Harbor.

In addition to the buttock pressure ulcers, Mr. Robinson developed a sacral ulcer, which was initially observed as a stage 2 ulcer and declined to a stage 3 ulcer, where it needed a topical debriding agent for which Santyl was ordered. According to the Report, when the skin impairment that developed into the sacral ulcer was initially observed on August 20, 2018, it was incorrectly classified as incontinence-associated dermatitis.

A Canton Harbor weekly skin report dated September 28, 2018, noted that Mr. Robinson had a suspected deep tissue injury ("SDTI") surrounding his sacral ulcer. According to Nurse Jones-Singh, an SDTI is damage to underlying skin "only caused by friction and/or shearing. Therefore, … Canton Harbor directly caused the SDTI to the sacrum noted on Mr. Robinson as there is no other etiology for this type of wound."

Nurse Jones-Singh observed that, on October 8, 2018, Mr. Robinson developed excoriation to his perineal area. According to the Report, this condition is "more than likely to develops [sic] with prolonged exposure to both urine/fecal matter," and "would have been prevented if Barrier Cream was being used with each incontinent change."

11

The Report then analyzed a September 13, 2018 nutritional assessment. According to Nurse Jones-Singh, "Mr. Robinson had been noted with hypoalbuminemia, indicative of malnutrition, and needed a specific amount of protein and calories per day to compensate for … noted weight loss and low protein levels." Nurse Jones-Singh further noted that Mr. Robinson "never had any supplements ordered for wound healing such as Vitamin C, Zinc Sulfate, or Prosource."

The Report also provided information about Mr. Robinson's assessments by a Canton Harbor primary care physician, Dr. Viray Shah. Dr. Shah conducted Mr. Robinson's initial physical examination on August 17, 2018, as well as eight subsequent examinations between August and December 2018. According to the Report, Dr. Shah did not mention Mr. Robinson's pressure ulcers in any of his assessments.

Based on her review of Mr. Robinson's medical records, Nurse Jones-Singh opined in the Report "to a reasonable degree of nursing certainty" that Canton Harbor "breached the standard of care for skilled nursing facilities/post-acute rehabilitation." She attested that "[t]he facts and clinical analysis in this report represent a deviation from the acceptable standard of nursing care." According to the Report, "[t]his includes violations of federal and state regulations, which are part of the acceptable standard of care and also [Canton Harbor's] own policies and procedures, which are part of the acceptable standard of care." The federal regulations upon which the Report relied in identifying the standard of care were 42 C.F.R. §§ 483.21 and 483.25. According to Nurse Jones-Singh, these federal regulations required Canton Harbor to develop a comprehensive care plan for each resident and to take various other steps to prevent avoidable pressure ulcers, and Canton Harbor

12

failed to abide by these regulations with respect to Mr. Robinson. Nurse Jones-Singh opined that Canton Harbor's "statutory breaches" caused Mr. Robinson to develop the injuries to his left buttock and right buttock, as well as the sacral ulcer and SDTI.

Specifically, Nurse Jones-Singh opined in the Report that Canton Harbor departed from the standard of nursing care through: "[f]ailure to prevent, monitor, document, manage, and treat skin injury"; "[f]ailure to provide personal hygiene such that actual harm occurred"; "[f]ailure to train and monitor staff compliance related to: Routine skin and pain assessments, ITD[11] communication and coordination of care, and care of blistering (lower leg extremity) skin"; "[f]ailure to provide adequate nutrition"; "[f]ailure to address abnormal labs"; and "[f]ailure to accurately complete MDS assessments driving the care planning process[;]" i.e., "[f]ailing to write and maintain up to date care plan interventions that support skin breakdown prevention [and] healing."

Nurse Jones-Singh also opined concerning Dr. Shah's failure to order pain medication for Mr. Robinson. According to the Report, "[t]he standard of practice would require that a patient/resident who has multiple wounds or stage 3-4 wounds receive pain medication 30 minutes to an hour prior to dressing changes." Because Dr. Shah failed to

---

[11] Nurse Jones-Singh did not say what "ITD" stands for in the Report. We have seen reference in wound care-related literature to "ITD" as an acronym for intertriginous dermatitis. *See* Holly M. Hovan, *Intertriginous Dermatitis: Risk Factors, Diagnosis, Prevention, and Treatment*, WOUND SOURCE (Oct. 7, 2021), available at https://perma.cc/J9HM-G9LQ. "[A]lso referred to as intertrigo, [ITD] is an inflammatory condition that affects opposing skin surfaces and can occur anywhere on the body where two surfaces are in contact." *Id.*

prescribe pain medication for Mr. Robinson, Nurse Jones-Singh opined that Mr. Robinson "suffered unnecessary pain during his dressing changes[.]"

According to Nurse Jones-Singh, given Mr. Robinson's high-risk assessments, a "potential for impaired skin integrity care plan should have been completed on admission or no later than 72 hours after," but was only implemented on September 17, 2018, one month after admission. Further, Nurse Jones-Singh attested that a nutritional deficit care plan, a weight loss care plan, and a "Pain r/t Wounds" care plan were required under the standard of care, but Canton Harbor did not develop any of these care plans. Nurse Jones-Singh also attested that "several breaches occurred causally related to Mr. Robinson's decline in health such that harm occurred including … [c]ompleting Braden Scales correctly to proactively adapt the careplanning process based on accurate assessment findings" and "[c]onduct[ing] a comprehensive and routine pain assessment." In addition, Nurse Jones-Singh opined that "the facility failed to meet Mr. Robinson's nutritional requirements thereby contributing to his skin breakdown."

## D. The Circuit Court Proceedings

Canton Harbor elected to waive arbitration under CJP § 3-2A-06B, and the case accordingly was transferred from the HCADRO. The Robinsons subsequently filed their Complaint against Canton Harbor in the Circuit Court for Baltimore City. Count One, brought by Mrs. Robinson in her individual capacity and as the personal representative of Mr. Robinson's estate, alleged negligence based on Canton Harbor having allowed Mr. Robinson to develop pressure ulcers that spread and became infected. The negligence claim further alleged that, after Mr. Robinson was transferred from Canton Harbor, "this

14

condition worsened and he became septic and died." Count Two, brought by Mrs. Robinson and Mr. Robinson's surviving children, alleged wrongful death.

Canton Harbor moved to dismiss the Complaint on the ground that, as a registered nurse, Nurse Jones-Singh is not qualified to attest to the proximate cause of Mr. Robinson's medical injuries. Canton Harbor observed that, under Maryland law, the practice of registered nursing includes making a "nursing diagnosis." *See* Md. Code Ann., Health Occ. ("HO") § 8-101(o)(1) (1981, 2021 Repl. Vol., 2024 Supp.). Canton Harbor also noted in its motion that Maryland regulations define "[n]ursing diagnosis" as "**a description** of the actual or potential, overt or covert health problems which registered nurses are licensed to treat." COMAR 10.27.09.01B(16) (emphasis added by Canton Harbor). Canton Harbor further observed, by way of comparison, that "[p]ractice medicine" is defined under Maryland law as "to engage, with or without compensation, in **medical**: (i) **Diagnosis**; (ii) Healing; (iii) Treatment; or (iv) Surgery." HO § 14-101(o)(1) (emphasis added by Canton Harbor). Because "medical diagnosis" is not defined by statute or regulation, Canton Harbor pointed to dictionary definitions of "diagnosis," including two of Merriam-Webster's definitions of the term: "the art or act of identifying a disease from its signs and symptoms," and "investigation or analysis of the cause or nature of a condition, situation, or problem."[12] Thus, Canton Harbor argued, a "medical diagnosis" means the determination of medical conditions, as well as the cause or nature of such conditions – tasks that are outside of the scope of a registered nurse's practice.

---

[12] Merriam-Webster, *Diagnosis*, available at https://perma.cc/6F2Z-CSG8.

Opposing the motion to dismiss, the Robinsons noted that they had not brought a claim against a physician. Rather, because their claim is against Canton Harbor – a skilled nursing facility – Nurse Jones-Singh "is providing peer to peer review," as required under the Act. According to the Robinsons, if the General Assembly had intended that only physicians opine on the issue of proximate causation, it specifically would have said so in CJP § 3-2A-02(c)(2)(ii), rather than referring more generally to "a health care provider," which, as defined in CJP § 3-2A-01(f)(1), includes a registered nurse. The Robinsons also argued that, if the court were to rule that Nurse Jones-Singh was not qualified to attest to proximate causation, good cause existed to grant the Robinsons a 90-day extension of time to secure a certificate from another expert.

The Robinsons attached an affidavit of Nurse Jones-Singh to their opposition to the motion to dismiss. In her affidavit, Nurse Jones-Singh averred that she had been a registered nurse for more than 16 years, over which time she had "routinely perform[ed] skin evaluations on [her] patients, identified pressure ulcers, classified the staging of each ulcer and proposed a treatment and care plan to heal the ulcer." She stated that she had made these determinations for over 500 patients. At the time she signed her affidavit, Nurse Jones-Singh was "a long-term care Director of Nursing and Resident Assessment Coordinator." Previously, she worked as a wound care nurse where, according to Nurse Jones-Singh, she "routinely diagnosed the cause of pressure ulcers."

The circuit court held a hearing on Canton Harbor's motion to dismiss, in the course of which the Robinsons abandoned their wrongful death claim. The court determined that, as a registered nurse, Nurse Jones-Singh is qualified to attest to the standard of care for

16

nurses and to the departure from that standard of care. However, the court concluded that a registered nurse "cannot make a medical diagnosis, and therefore, cannot determine a medical condition nor the cause of a condition." Thus, the circuit court ruled, Nurse Jones-Singh may not attest in a certificate that a departure from the standard of care is the proximate cause of Mr. Robinson's alleged injury. The court further determined that the Robinsons had not shown good cause for an extension of time to secure a certificate from another expert on the issue of proximate causation. The court entered a written order dismissing the Complaint.

### E. Appeal

Mrs. Robinson[13] appealed the dismissal of the Complaint to the Appellate Court of Maryland, which reversed. The Appellate Court held that "under Maryland's statutory and regulatory framework governing nursing services at a skilled nursing facility like Canton Harbor, a [certificate] may be predicated on the attestation of a registered nurse that breach of nursing standards for preventing and treating decubitus ulcers proximately caused the ulcer injury alleged in the negligence complaint." *Robinson*, 261 Md. App. at 583. The Appellate Court reasoned that "Canton Harbor's argument that 'nursing diagnosis' is merely a 'description of … health problems' and therefore precludes nurses from opining

---

[13] The brief urging affirmance of the Appellate Court's judgment indicates that it has been filed on behalf of "Felicia Robinson, et al. (the Respondents)." As noted above, the Robinsons abandoned their wrongful death claim at the hearing on Canton Harbor's motion to dismiss. Thus, we agree with the Appellate Court that the viability of Count One – the negligence claim brought by Mrs. Robinson alone – is the only live issue on appeal. *See Robinson*, 261 Md. App. at 563 n.1. From this point forward, we will refer only to Mrs. Robinson as the plaintiff in this case.

on proximate causation in all cases ignores how nursing diagnosis fits within the regulations concerning standards of practice for registered nurses." *Id.* at 585. Those regulations "implicitly require[] registered nurses, acting within the scope of their duties, to assess the probable *cause* of further injury if nursing intervention is unsuccessful." *Id.* Thus, the Appellate Court held that "in negligence cases alleging breach of nursing standards for preventing and treating decubitus ulcers, a registered nurse is not disqualified *per se* to attest that failure to adhere to such standards proximately caused the plaintiff's ulcer injury." *Id.* at 588. The Appellate Court determined that the Jones-Singh Certificate met the Act's requirements. *Id.* at 590-91. The Appellate Court vacated the circuit court's judgment and remanded for further proceedings. *Id.* at 591-92.[14]

Canton Harbor subsequently filed a petition for writ of *certiorari*, which we granted. *Canton Harbor Healthcare Ctr. v. Robinson*, 488 Md. 386 (2024). We agreed to review three questions,[15] which we have rephrased and condensed to two:

---

[14] Because the Appellate Court concluded that Nurse Jones-Singh was qualified under the Act to sign the Certificate, the Appellate Court did not address Mrs. Robinson's alternative argument that the circuit court erred in not granting an extension of time to file an additional certificate on the issue of proximate causation signed by a different expert. 261 Md. App. at 591 n.11.

[15] The three questions in Canton Harbor's petition were:

1. Whether a registered nurse can be a "qualified expert" to attest "that the departure from standards of care is the proximate cause of the alleged injury" as required by CJP §3-2A-04(b)(1)(i), even though offering a medical diagnosis is outside of the authorized scope of nursing practice in Maryland.

18

1. Did the circuit court correctly conclude that Nurse Jones-Singh is not qualified to attest in the Certificate that Canton Harbor's alleged departure from the applicable standard of care is the proximate cause of Mr. Robinson's pressure ulcers?

2. May a registered nurse attest in a certificate of qualified expert to the standard of care applicable to a physician and to a physician's alleged departure from that standard of care?

We answer both questions in the negative.

## II

## Standard of Review

The sufficiency of a certificate of a qualified expert is a question of law that we review *de novo*. *See Carroll v. Konits*, 400 Md. 167, 180 n.11 (2007); *Jordan v. Elyassi's Greenbelt Oral & Facial Surgery, P.C.*, 256 Md. App. 555, 567 (2022).

## III

## Discussion

As it did below, Canton Harbor argues here that, although a registered nurse may be qualified to attest to a breach in the standard of nursing care for preventing and treating pressure ulcers, a registered nurse is not qualified to attest to the proximate cause of a particular pressure ulcer. Canton Harbor also contends that Nurse Jones-Singh violated the

---

2. Whether a registered nurse can opine whether physicians wrongfully failed to prescribe medicines or undertake appropriate treatment plans[.]

3. Whether the Appellate Court improperly relied on federal regulations governing Medicare/Medicaid funding of nursing facilities in determining the qualifications of a registered nurse to give a medical causation opinion.

Act's peer-to-peer rule by attesting in the Certificate to the standard of care applicable to Canton Harbor's physicians and the physicians' breaches of those standards of care.

Mrs. Robinson contends that an experienced registered nurse, such as Nurse Jones-Singh, may provide an opinion on the cause of pressure ulcers in a certificate filed under the Act.

Resolution of the parties' competing contentions requires us to interpret pertinent provisions of the Act and other statutes. The goal of statutory interpretation is to "ascertain and effectuate the actual intent of the General Assembly in enacting the law under consideration." *Matter of Collins*, 468 Md. 672, 689 (2020). In conducting this inquiry, "we begin with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology." *Blackstone v. Sharma*, 461 Md. 87, 113 (2018) (internal quotation marks and citations omitted). If the statutory language is "unambiguous and clearly consistent with the statute's apparent purpose, [the] inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction." *Lockshin v. Semsker*, 412 Md. 257, 275 (2010). We "neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with forced or subtle interpretations that limit or extend its application." *Id.* (internal quotation marks and citations omitted). Rather, we construe the statute "as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Mayor & Town Council of Oakland v. Mayor & Town Council of Mountain Lake Park*, 392 Md. 301, 316 (2006). We do not "read statutory language in a vacuum, nor do we confine

20

strictly our interpretation of a statute's plain language to the isolated section alone." *Lockshin*, 412 Md. at 275. "Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Id.* at 276. We presume "that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Id.* To the extent there is ambiguity in statutory language, we strive to resolve it by "searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process." *Id.* We also often review legislative history to determine whether it confirms the interpretation suggested by our analysis of the statutory language. *See, e.g.*, *In re O.P.*, 470 Md. 225, 255 (2020). Further, we "check our interpretation against the consequences of alternative readings of the text," *Bell v. Chance*, 460 Md. 28, 53 (2018), which "grounds the analysis." *In re O.P.*, 470 Md. at 255. Doing so helps us "avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense," *Mayor & Town Council of Oakland*, 392 Md. at 316; *see also Bell*, 460 Md. at 53 (explaining that, throughout the statutory interpretation process, "we avoid constructions that are illogical or nonsensical, or that render a statute meaningless").

We conclude that, where a patient was previously diagnosed as having developed a pressure ulcer at a skilled nursing facility, a registered nurse who meets the peer-to-peer requirement of CJP § 3-2A-02(c)(2)(ii)1A may attest in a certificate that a breach of the applicable standards of nursing care at the facility proximately caused the pressure ulcer,

21

provided that the nurse's opinion consists of a nursing diagnosis and does not address medical causation. Here, according to the Report, Mr. Robinson was diagnosed by Canton Harbor staff as suffering from pressure ulcers that he developed while a patient at Canton Harbor. Nurse Jones-Singh meets the peer-to-peer requirement to the extent she attests to alleged breaches of care by Canton Harbor's nurses. She does not meet the peer-to-peer requirement to the extent she attests to the standards of care applicable to Canton Harbor's physicians and to the physicians' alleged departures from those standards of care.

A review of the Certificate and attached Report shows that Nurse Jones-Singh attested to alleged breaches of care by Canton Harbor's nurses and to those breaches having proximately caused Mr. Robinson's pressure ulcers. In so doing, Nurse Jones-Singh did not make a medical diagnosis. Because the Certificate meets the requirements of the Act, Mrs. Robinson's negligence claim may go forward.

A. **In Some Circumstances, a Registered Nurse May Attest in a Certificate That a Breach of the Applicable Standard of Nursing Care Is the Proximate Cause of a Pressure Ulcer.**

1. A Registered Nurse Who Attests in a Certificate Concerning a Previously Diagnosed Pressure Ulcer Does Not Exceed the Bounds of Nursing Practice.

As discussed above, the Act contemplates that a "health care provider" will "attest[] in a certificate of a qualified expert … concerning a defendant's compliance with or departure from standards of care[.]" CJP § 3-2A-02(c)(2)(ii)1. Under the Act, a registered nurse is a "health care provider." *Id.* § 3-2A-01(f)(1). Thus, the plain language of the Act demonstrates that a registered nurse may be a "qualified expert" who attests in a required

22

certificate "to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury[.]" *Id.* § 3-2A-04(b)(1)(i)1.

Canton Harbor recognizes that a registered nurse, in some circumstances, may attest to the applicable standards of nursing care and to the departure from those standards of care. However, Canton Harbor draws the line at a registered nurse attesting that a departure from the standards of nursing care is the proximate cause of a patient's medical injuries. According to Canton Harbor, allowing a registered nurse to attest to the proximate cause of a medical injury would be tantamount to allowing a registered nurse to make a medical diagnosis, which in turn would mean that the nurse is practicing outside the scope of their nursing license. In the circumstances of this case, we disagree.

Two points are central to our analysis. First, where a patient has previously been diagnosed with a particular medical injury by another health care provider, a registered nurse who relies on that pre-existing diagnosis does not make a diagnosis concerning the injury itself in a certificate filed under the Act. Rather, the nurse accepts the accuracy of the pre-existing diagnosis made by another health care provider(s). A different situation arises where a registered nurse purports to diagnose a medical condition or other medical injury in the first instance in a certificate.

Second, a registered nurse does not exceed the bounds of nursing practice when the nurse opines in a certificate that a departure from the standards of nursing care is the proximate cause of a previously diagnosed pressure ulcer that developed while the patient resided at a skilled nursing facility.

Maryland's Nursing Practice Act defines "[p]ractice registered nursing" as

> the performance of acts requiring substantial specialized knowledge, judgment, and skill based on the biological, physiological, behavioral, or sociological sciences as the basis for assessment, nursing diagnosis, planning, implementation, and evaluation of the practice of nursing in order to:
> 
> (i)  Maintain health;
> 
> (ii)  Prevent illness; or
> 
> (iii)  Care for or rehabilitate the ill, injured, or infirm.

HO § 8-101(o)(1).

Maryland regulations set forth standards of care for registered nurses. *See* COMAR 10.27.09.02. Among other things, a nurse must collect client health data, including physical, psychological, sociocultural, spiritual, cognitive, functional abilities, developmental, economic, technology, and lifestyle data. COMAR 10.27.09.02A(2)(b). Data collection must be "comprehensive, systematic, and ongoing." COMAR 10.27.09.02A(6). "Relevant health status data, including changes, shall be documented in an authorized record which is accessible and in a retrievable form." COMAR 10.27.09.02A(7).

An important part of a nurse's duties is to make a "nursing diagnosis," when appropriate. As Canton Harbor observes, Maryland regulations define "[n]ursing diagnosis" as "a description of the actual or potential, overt or covert health problems which registered nurses are licensed to treat." COMAR 10.27.09.01B(16). But other regulations make clear that arriving at a nursing diagnosis may require significant time, effort, and expertise. A nurse must "analyze the assessment data[,]" COMAR

24

10.27.09.02B(1), "consider the options …, and make a determination as to whether the selected options are appropriate for the needs of the client." COMAR 10.27.09.02B(2)(a). A nursing diagnosis must be "[d]erived in a complete, systematic, and ongoing manner from the assessment of data," "[v]alidated with the client, family, significant others, and other members of the health care team, when possible," and "[d]ocumented in a manner that facilitates the determination of expected outcomes and plan of care." COMAR 10.27.09.02B(2)(b). A nursing diagnosis must "identify the nature and extent of the client's health status, capabilities, and limitations." COMAR 10.27.09.02B(2)(c).

Once a nurse makes a nursing diagnosis, the nurse's work does not stop there. Rather, a nurse is required to "identify expected outcomes individualized to the client." COMAR 10.27.09.02C(1). Such outcomes must, among other things, be "[d]erived in a comprehensive, systematic, and ongoing manner from the diagnoses," and "[d]irected toward management of the client's health problems." COMAR 10.27.09.02C(2)(a)(i) and (ii).

A nurse must then "develop a plan of care that prescribes interventions to attain expected outcomes." COMAR 10.27.09.02D(1). That plan, among other things, must be "[i]ndividualized in a comprehensive, systematic and ongoing manner[.]" COMAR 10.27.09.02D(2)(a)(i). The nurse must then "implement the interventions identified in the plan of care … [c]onsistent with the established plan of care[,]" among other criteria. COMAR 10.27.09.02E. Finally, a nurse must "evaluate the client's progress toward attainment of outcomes." COMAR 10.27.09.02F. That evaluation must be "systematic, ongoing, and criterion based." COMAR 10.27.09.02F(2)(a). Among other measurement

25

criteria, the nurse's evaluation must use "[o]ngoing assessment data … to evaluate the process of care and to revise the nursing diagnosis, outcomes, and the plan of care[,]" COMAR 10.27.09.02F(2)(c), and "[t]he responses to interventions" must "be documented and communicated to the client and other members of the health care team." COMAR 10.27.09.02F(2)(f).

These regulations highlight the complexity of modern nursing – a practice that extends far beyond a mere "description" of health problems. The practice of registered nursing requires *identifying* and collecting data in a comprehensive and ongoing manner, *analyzing* such data to create a nursing diagnosis that identifies the nature and extent of the client's health status, identifying expected outcomes, *developing a plan of care* that *prescribes interventions* to attain expected outcomes, *implementing the interventions*, and *evaluating the client's progress* toward attainment of those outcomes.

In addition, federal Medicare and Medicaid regulations applicable to skilled nursing and other long-term care facilities require such facilities, consistent with professional standards of practice, to prevent pressure ulcers unless they are unavoidable, and to treat existing pressure ulcers. *See* 42 C.F.R. § 483.25(b).[16] Indeed, federal regulations classify

---

[16] 42 C.F.R. § 483.25(b) provides:

Based on the comprehensive assessment of a resident, the facility must ensure that—

(i) A resident receives care, consistent with professional standards of practice, to prevent pressure ulcers and does not develop pressure ulcers unless the individual's clinical condition demonstrates that they were unavoidable; and

"[t]reatment of extensive decubitus ulcers or other widespread skin disorder" as skilled nursing services. *Id.* § 409.33(b)(6).[17] A Maryland statute governing quality assurance programs in nursing homes similarly identifies "prevention of decubitus ulcers" as "nursing care." Md. Code Ann., Health-Gen. § 19-1410(b)(5)(ii) (1982, 2023 Repl. Vol.).

Identification, prevention, and treatment of pressure ulcers fall comfortably within the scope of nursing care – especially in the context of skilled nursing facilities. And it is at least an open question whether identifying the proximate cause of a pressure ulcer is within the proper scope of rendering a nursing diagnosis and does not constitute or require making a medical diagnosis. *See Robinson*, 261 Md. App. at 587 ("Because managing decubitus ulcers constitutes the type of core 'skilled nursing services' that may be within the expertise of a registered nurse," a "registered nurse may be qualified to attest that breach of applicable standards of nursing care for preventing and treating decubitus ulcers proximately caused the plaintiff's ulcer injury.").[18] Thus, where a nursing diagnosis is

_____

(ii) A resident with pressure ulcers receives necessary treatment and services, consistent with professional standards of practice, to promote healing, prevent infection and prevent new ulcers from developing.

[17] Pertinent to the third question contained in its petition for *certiorari*, Canton Harbor contends that the Appellate Court improperly determined that 42 C.F.R. § 483.25(b) and other federal regulations that Nurse Jones-Singh cited in her Report establish the standard of care applicable to Canton Harbor. Canton Harbor is incorrect. The Appellate Court did not conclude that these federal regulations establish the standards of nursing care that apply to this case. Rather, the Appellate Court explained that the federal regulations, in conjunction with the Maryland regulations we have discussed above, demonstrate that managing pressure ulcers falls within the scope of skilled nursing services. *See Robinson*, 261 Md. App. at 585-86. We agree with the Appellate Court.

[18] The academic literature that Justice Booth discusses in her separate opinion, *see* Concurring and Dissenting Op. of Booth, J., at 32-37, suggests that it is an open question

explicitly or implicitly claimed to suffice to opine concerning the proximate cause of a pressure ulcer, a registered nurse may attest as to proximate causation in a certificate.

Because a registered nurse cannot render an opinion on medical causation, we add the qualification that the patient's pressure ulcer must have been previously diagnosed by another qualified health care provider, unless the certifying registered nurse, in the course of personally examining the patient, observed the wound and identified it as a pressure ulcer. If a registered nurse knows (based on a pre-existing diagnosis) that the patient developed a pressure ulcer while a resident of a skilled nursing facility, the nurse may be qualified to attest in a certificate that a breach of the applicable standard of nursing care is the proximate cause of the pressure ulcer.[19] This interpretation harmonizes the certificate provisions of the HCMCA with the definition of "practice registered nursing" in the Nursing Practice Act. *See Lockshin*, 412 Md. at 276 (explaining that this Court "presume[s] that the Legislature intends its enactments to operate together as a consistent and harmonious body of law").

---

whether pressure ulcers can be identified through a nursing diagnosis as opposed to a medical diagnosis. *See also* note 25 below.

[19] The federal and Maryland regulations that the Appellate Court and we have cited reflect that registered nurses at skilled nursing facilities who examine clients' wounds are expected to be able to identify those wounds that are pressure ulcers and to treat them accordingly. If a nurse has not personally examined a patient and identified a wound as a pressure ulcer in conjunction with making a nursing diagnosis, the nurse may not in the first instance diagnose the wound as a pressure ulcer in a certificate or attached report, which would constitute making a medical diagnosis.

2. <u>In a Claim Against a Skilled Nursing Facility, a Registered Nurse May Be Qualified Under CJP § 3-2A-02(c)(2)(ii)1A to Attest to Breaches of the Applicable Standard of Care by Nurses at the Facility, but Not by Physicians.</u>

As discussed above, the Act contains a peer-to-peer qualification requirement. That is, a health care provider attesting in a certificate must have had clinical experience, provided consultation relating to clinical practice, or taught medicine in the defendant's specialty or a related field of health care, or in the field of health care in which the defendant provided care or treatment to the plaintiff, within five years of the date of the alleged act or omission giving rise to the cause of action. CJP § 3-2A-02(c)(2)(ii)1A.

Canton Harbor observes that Nurse Jones-Singh's Certificate and Report "identify nurses generally, individual nurses, *and named and unnamed physicians* whom she accuses of breaching the standard of care." Canton Harbor asserts that Nurse Jones-Singh is not qualified under the peer-to-peer rule to attest that any named or unnamed physician at Canton Harbor breached a physician's standard of care. Canton Harbor therefore takes issue with several of the Report's contentions, including that: (1) Dr. Shah should have prescribed pain medications for Mr. Robinson; (2) Dr. Shah failed to properly document Mr. Robinson's pressure ulcers; and (3) a physician should have prescribed Eliquis, an anticoagulant, for Mr. Robinson earlier than it was actually prescribed. On this point, we agree with Canton Harbor.

Although Canton Harbor is the defendant in this case, its alleged liability is vicarious. That is, if Canton Harbor is liable for negligence in the care of Mr. Robinson, that is because one or more of its agents was negligent. *See Retina Grp. of Washington, P.C. v. Crosetto*, 237 Md. App. 150, 172 n.13 (2018) ("[A] health care provider agent need

29

not be sued individually for the agent's principal to be liable under *respondeat superior*. It is sufficient that the principal is sued."). The fact that both physicians and registered nurses treated Mr. Robinson at Canton Harbor does not mean that Nurse Jones-Singh is qualified under CJP § 2-3A-02(c)(2)(ii)1A to attest to alleged breaches of the different standards of care that apply to the physicians and nurses at Canton Harbor. Nurse Jones-Singh does not have a peer-to-peer relationship with Dr. Shah or with any other physician who treated Mr. Robinson at Canton Harbor. However, if Nurse Jones-Singh has the requisite qualifications under CJP § 3-2A-02(c)(2)(ii)1A and otherwise qualifies to attest in a certificate under the Act, then she may attest to breaches of the applicable standards of nursing care by Canton Harbor's nurses in their treatment of Mr. Robinson.[20]

---

[20] Nurse Jones-Singh's Certificate and Report did not identify particular nurses who allegedly breached the standards of nursing care at Canton Harbor. Where an expert is able to identify in an initial certificate a specific health care provider whose departure from the standard of care proximately caused the patient's injury, the expert should identify that person. *See Carroll v. Konits*, 400 Md. 167, 195-96 (2007). However, there may be instances in which a certifying expert is unable to specifically identify the responsible health care providers in an initial certificate. *See Retina Grp. of Washington*, 237 Md. App. at 170-71 n.12 ("There may be situations in which, until discovery is undertaken, the plaintiff cannot determine the name of a health care provider agent whose conduct is implicated in causing the injury or death at issue. Until clarified in discovery, the health care provider agent can be identified by position or role. Similarly, there may be situations in which only through discovery does it become known that a particular health care provider agent was involved in the care at issue at all."). Where, as here, the certifying expert attests to breaches of the standards of nursing care through omissions, it may well be that the expert will be unable to specifically identify in an initial certificate the nurses who failed to take the actions the expert believes caused the patient's injuries. In such a situation, "the plaintiff's certifying expert's supplemental certificate, filed after the close of discovery" under CJP § 3-2A-06D, "can attest to a breach of the standard of care by such an agent and, of course, should fully identify all health care provider agents alleged to have breached the standard of care." *Id.* at 171 n.12.

**B. The Circuit Court Erred in Dismissing the Negligence Claim.**

At this stage of the case, the record reflects that Nurse Jones-Singh is qualified to make the required attestations in a certificate. As a registered nurse, Nurse Jones-Singh meets the definition of "[h]ealth care provider." CJP § 3-2A-01(f)(1). In addition, Nurse Jones-Singh averred in the Certificate that she met the 25 percent rule.[21] And, according to her affidavit, Nurse Jones-Singh had been a registered nurse for more than 16 years, and was currently a "long-term care Director of Nursing and Resident Assessment Coordinator." To the extent that Canton Harbor may be vicariously liable for its nurses' negligence in this case, these averments, on their face, are sufficient to show that Nurse Jones-Singh "had clinical experience … in the field of health care in which the defendant provided care or treatment to the plaintiff, within 5 years of the date of the alleged act or omission giving rise to the cause of action." CJP § 3-2A-02(c)(2)(ii)1A.

In keeping with the mandate of CJP § 3-2A-04(b)(1)(i)1, Nurse Jones-Singh attested in the Certificate that Canton Harbor breached standards of nursing care that proximately caused Mr. Robinson's pressure ulcer injuries. The Report stated that Canton Harbor's nurses were responsible for identifying, documenting, preventing, and treating pressure

---

In moving to dismiss the Complaint, Canton Harbor did not assert that the Jones-Singh Certificate was invalid because it and the Report failed to specifically identify the nurses whose breaches of the standard of care proximately caused Mr. Robinson's pressure ulcers. Nor did Canton Harbor put any of its records from Mr. Robinson's stay before the circuit court and argue that Nurse Jones-Singh, based on her review of those records, could have specifically identified the nurses who allegedly breached the standards of care.

[21] Nurse Jones-Singh was not required to aver in the Certificate that she met the 25 percent rule. *See Kearney v. Berger*, 416 Md. 628, 650-51 (2010).

ulcers. It identified specific standards of nursing care relating to the prevention and treatment of pressure ulcers, drawing from state and federal regulations, as well as Canton Harbor's own policies and procedures. The Report also stated several ways in which Canton Harbor's staff breached those standards of care with respect to the treatment of Mr. Robinson, and how those breaches caused Mr. Robinson's pressure ulcers. This sufficed to satisfy the requirements of CJP § 3-2A-04(b)(1)(i)1. To this extent, Nurse Jones-Singh's opinions are in the nature of a nursing diagnosis, not a medical diagnosis.[22]

To be sure, the Report contained several opinions that relate to conditions other than the "pressure ulcers" and "bedsores" that are alleged to be the actionable injuries in Count One of the Complaint. For example, the Report referred to arterial ulcers that Mr. Robinson developed at another facility and to excoriation to Mr. Robinson's perineal area. In addition, the Report included several opinions with respect to which Nurse Jones-Singh did not meet the peer-to-peer requirement of CJP § 3-2A-02(c)(2)(ii)1A. For example,

---

[22] We note that the supplemental certificate that Mrs. Robinson will be required to file within 15 days following the completion of discovery must contain more specifics, compared to an initial certificate, concerning the applicable standard of care, how the defendant breached that standard, and how the breach proximately caused the patient's injury. *See* CJP § 3-2A-06D(b)(1)(i) through (iv) (supplemental certificate must attest, among other things, to the certifying expert's "basis for alleging what is the specific standard of care"; the expert's "qualifications to testify to the specific standard of care"; the "specific standard of care"; for the plaintiff, "[h]ow the specific standard of care was breached"; "[w]hat specifically the defendant should have done to meet the specific standard of care"; and "[t]he inference that the breach of the standard of care proximately caused the plaintiff's injury"). Canton Harbor will also have to file a supplemental certificate signed by a qualified expert if it wishes to contest liability at trial. *See id.* § 3-2A-06D(a)(2) & 3-2A-06D(b)(1)(i) through (iii) and (v). For both a plaintiff and a defendant, "[t]he facts required to be included in the supplemental certificate of a qualified expert shall be considered necessary to show entitlement to relief sought by a plaintiff or to raise a defense by a defendant." *Id.* § 3-2A-06D(b)(3).

Nurse Jones-Singh opined that Dr. Shah should have prescribed pain medication for Mr. Robinson and that Eliquis should have been ordered for Mr. Robinson sooner than occurred.

The presence of opinions in the Report that go beyond the scope of the alleged injuries in the Complaint and violate the peer-to-peer requirement does not invalidate the Certificate. The Act's certificate requirement is designed to ensure "that a health care provider who is not a party has reviewed the claim. It helps ensure that completely spurious claims do not go forward." *Breslin v. Powell*, 421 Md. 266, 285 (2011) (quoting Final Report, November 2004 Governor's Task Force on Medical Malpractice and Health Care Access, at 31). The Jones-Singh Certificate serves that function to the extent it attests to standards of nursing care involving pressure ulcers, Canton Harbor's departures from those standards of care, and that those departures proximately caused Mr. Robinson's pressure ulcers.[23]

This is not to say that Nurse Jones-Singh will ultimately be permitted to testify at trial, assuming that Mrs. Robinson designates Nurse Jones-Singh as a testifying expert witness. That will be a decision, in the first instance, for the trial court to make. To that

---

[23] The out-of-state cases cited by Canton Harbor and their *amici* concern requirements beyond those set forth in CJP § 3-2A-02(c)(2)(ii)1A, involve proffered expert testimony at trial, and/or involve opinions about subjects, unlike pressure ulcers, that are outside a nurse's area of expertise and venture into medical diagnosis, including cause of death. *See, e.g.*, *Leckrone v. Kimes Convalescent Ctr.*, 168 N.E.3d 565, 569-70 (Ohio Ct. App. 2021) (analyzing an "affidavit of merit" under Ohio law, which must meet a reliability requirement); *Freeman v. LTC Healthcare of Statesboro, Inc.*, 766 S.E.2d 123, 126 (Ga. Ct. App. 2014) (affirming summary judgment for facility where cause of decedent's respiratory failure and death was beyond nurse's area of expertise). As such, these cases are not helpful in analyzing the application of Maryland law in this pressure ulcer case.

end, it is possible there will be a hearing under *Rochkind v. Stevenson*, 471 Md. 1 (2020) (adopting framework set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)), to determine whether Nurse Jones-Singh's opinions are admissible under Maryland Rule 5-702; i.e., whether: (1) Nurse Jones-Singh is qualified as an expert by knowledge, skill, experience, training, or education; (2) the appropriateness of her proffered expert testimony on the particular subject; and (3) whether a sufficient factual basis exists to support her expert testimony. The fact that Nurse Jones-Singh meets the Act's peer-to-peer requirement does not mean that the trial court necessarily will conclude that she "is qualified as an expert by knowledge, skill, experience, training, or education," Md. Rule 5-702(1), to testify as an expert at trial. In addition, it is not our task (or that of the trial court) at this stage to opine concerning the reliability of any of the opinions included in Nurse Jones-Singh's Report. *See Kearney v. Berger*, 416 Md. 628, 652-53 (2010) ("The claimant or plaintiff is not required to prove his or her case with the certificate, but instead must present an expert's opinion that provides enough information to support the conclusion that the defendant may have violated the standard of care. For this purpose, the HCADRO or trial court accepts the assertions in the certificate, just as courts accept a plaintiff's well-pleaded facts and allegations in a complaint.")[24]; *see also*

---

[24] Justice Watts is concerned that our decision will require the "HCADRO, which is a unit in the Executive Department headed by the Director," to "schedule the filing of memoranda, hold contested hearings, and issue rulings" as to certifying experts' qualifications, a requirement that the "HCADRO is not prepared to screen for or make a determination about." Concurring Op. of Watts, J., at 15, 18. There is a difference between determining that a certificate does not, on its face, meet the requirements of the HCMCA because, for example, it does not address proximate cause at all, and determining that a certificate is invalid because the attesting healthcare provider lacks the requisite

*id.* (certificate need not state opinions to a reasonable degree of medical probability).[25] We express no view as to whether the federal regulations upon which Nurse Jones-Singh relied in the Report provide the applicable standard of care in this case. Nor do we express any view concerning the merits of any of the other opinions included in the Report. These are matters that may be explored in discovery and in further proceedings in the trial court.

---

qualifications to opine concerning proximate cause. We do not envision that the Director will make a determination concerning the latter type of issue prior to the case going before an arbitration panel or, if arbitration is waived, the case being filed in court. *See Kearney*, 416 Md. at 664 ("Nothing in the HCMCA instructs the Director to evaluate the certificate[.]"); CJP § 3-2A-04(b)(1)(ii) (providing that, "[i]n lieu of dismissing the claim or action, the *panel chairman or the court* shall grant an extension of no more than 90 days for filing the certificate required by this paragraph" if certain conditions are met) (emphasis added). Once a case is before an arbitration panel or a court, a party may seek relief on the ground that a certificate is invalid due to the attesting healthcare provider lacking the necessary qualifications, as occurred in this case.

[25] As noted above, there seemingly is an open question in the scientific and medical community about whether pressure ulcers can be identified through a nursing diagnosis as opposed to a medical diagnosis. Based on our review of the literature, it strikes us as possible that the cause of some pressure ulcers can be ascertained by way of a nursing diagnosis, while other cases may require a medical diagnosis. The import of Nurse Jones-Singh's certificate is that this is a case in which a medical diagnosis is unnecessary. Canton Harbor can contest that in a *Daubert-Rochkind* hearing challenging Nurse Jones-Singh's qualifications if it chooses to do so. Or it can challenge Nurse Jones-Singh's opinion as to proximate causation on the merits. In either event, the proper vehicle for the challenge is not a motion to dismiss claiming a deficiency in the certificate. Similarly, Canton Harbor can complain about the allegedly "*ipse dixit*" nature of Nurse Jones-Singh's opinion, *see* Concurring and Dissenting Op. of Booth, J., at 37-38, in a *Daubert-Rochkind* hearing.

We do not rule out the possibility that, in another case, a court or arbitration panel could find a registered nurse's certificate invalid either because: (1) the nurse's proximate causation opinion is, in actuality, a medical diagnosis, not a nursing diagnosis; or (2) it is established in that case that a nursing diagnosis is not sufficient to determine the proximate cause of the pressure ulcer in question. In other words, we do not hold that, as a matter of law and in every case, a registered nurse may validly attest in a certificate concerning the proximate cause of a pressure ulcer.

# IV

## Conclusion

Where a patient was previously diagnosed as having developed a pressure ulcer at a skilled nursing facility, a registered nurse who meets the peer-to-peer requirement of CJP § 3-2A-02(c)(2)(ii)1A may attest in a certificate that a breach of the applicable standards of nursing care at the facility proximately caused the pressure ulcer. It is undisputed that Mr. Robinson was diagnosed by Canton Harbor staff as suffering from pressure ulcers that he developed during his stay at Canton Harbor. Nurse Jones-Singh meets the peer-to-peer requirement to the extent she attests to alleged breaches of standards of nursing care by Canton Harbor's nurses. In the Certificate and attached Report, Nurse Jones-Singh attested to alleged breaches of care by Canton Harbor's nurses and to those breaches having proximately caused Mr. Robinson's pressure ulcers. Accordingly, the Certificate met the requirements of the Act. The Appellate Court correctly concluded that Mrs. Robinson's negligence claim against Canton Harbor may go forward.

Chief Justice Fader and Justice Gould join this opinion.

**JUDGMENT OF THE APPELLATE COURT AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

36

IN THE SUPREME COURT

OF MARYLAND

No. 22

September Term, 2024

_____

CANTON HARBOR HEALTHCARE
CENTER, INC.

v.

FELICIA ROBINSON, ET AL.

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

_____

Concurring Opinion by Watts, J.

_____

Filed:  July 29, 2025

Respectfully, I concur. I agree with the Majority that the Circuit Court for Baltimore City erred in dismissing the complaint in the case. See Maj. Slip Op. at 31, 36. I also would affirm the judgment of the Appellate Court of Maryland. But, because I would affirm the judgment of the Appellate Court for different reasons than the Majority, I write separately.

In this case, Everett Robinson was transferred to Canton Harbor Healthcare Center, Inc. d/b/a FutureCare-Canton Harbor ("Canton Harbor"), Petitioner, in August 2018 after suffering a stroke that left him unable to move independently and completely dependent on others for care. While at Canton Harbor, Mr. Robinson developed bedsores and the areas became infected. Mr. Robinson was eventually transferred to another facility to receive treatment, but, unfortunately, his wounds became septic and he died in March 2019. Felicia Robinson, Mr. Robinson's wife, as well as Mr. Robinson's three children (collectively, "the Robinsons"), Respondents, filed a claim against Canton Harbor alleging negligence and wrongful death. To comply with the Health Care Malpractice Claims Act ("HCMCA"), the Robinsons filed a certificate of qualified expert ("CQE") authored by a registered nurse, Anjanette Jones-Singh.

In the circuit court, Canton Harbor moved to dismiss the Robinsons' complaint, challenging the CQE's sufficiency. Canton Harbor argued that Nurse Jones-Singh was not qualified to offer an opinion on the medical or proximate cause of Mr. Robinson's bedsores, as she, a registered nurse, is not qualified to make medical diagnoses. The circuit court granted the motion to dismiss.

The HCMCA is set forth at Md. Code Ann., Cts. & Jud. Proc. (1974, 2020 Repl.

Vol.) ("CJ") §§ 3-2A-01 through 3-2A-10. The General Assembly's purpose in enacting the HCMCA was to provide for a "mandatory arbitration system for all medical malpractice claims in excess of a certain amount[.]" 1976 Md. Laws 495 (Vol. I, Ch. 235, S.B. 436).[1] The statute was part of a "multi-phase response to a malpractice insurance 'crisis' that arose in 1974" when the company that insured approximately 85% of physicians practicing in Maryland ceased offering medical malpractice insurance in the State. Witte v. Azarian, 369 Md. 518, 526, 801 A.2d 160, 165 (2002). The HCMCA was "an attempt by the General Assembly, in substantial part, to limit the filing of frivolous malpractice claims" and to provide for screening of malpractice claims prior to the filing of lawsuits. Carroll v. Konits, 400 Md. 167, 176-78, 929 A.2d 19, 25-26 (2007) (citations omitted).

The CQE requirement was added to the HCMCA in 1986. See Breslin v. Powell, 421 Md. 266, 282-84, 26 A.3d 878, 887-89 (2011). The General Assembly's purpose in amending the HCMCA to include the CQE requirement was to "weed out" non-meritorious claims. See id. at 284, 26 A.3d at 889 (citations omitted); see also Walzer v. Osborne, 395 Md. 563, 582, 911 A.2d 427, 438 (2006) ("[T]he General Assembly enacted the [HCMCA] for purposes of weeding out non-meritorious claims and to reduce the costs of litigation."). In describing the merits of the CQE requirement, the Governor's 2004 Task Force on Medical Malpractice and Health Care Access stated:

> This certificate requirement ensures that a health care provider who is not a party has reviewed the claim. It helps ensure that completely spurious claims

-----

[1]Consistent with the authority granted by the HCMCA, see CJ § 3-2A-03(b)(3), the Director of the Health Care Alternative Dispute Resolution Office has promulgated regulations that are set forth in Title 01, Subtitle 03 of the Code of Maryland Regulations.

do not go forward. It also provides a mechanism for the Board of Physicians to receive notice of a claim.

See Final Report, November 2004 Governor's Task Force on Medical Malpractice and Health Care Access, at 31, available at https://msa.maryland.gov/megafile/msa/speccol/ sc5300/sc5339/000113/000000/000455/unrestricted/20040962e.pdf [https://perma.cc/ 2ATM-X5NQ]; see also Breslin, 421 Md. at 284-85, 26 A.3d at 890.

The HCMCA sets forth two main options—(1) that a claim will be reviewed by an arbitration panel with an award either being denied or established with procedures under which the claimant can either accept or reject the award or (2) that the claimant and defendant can agree to waive arbitration and take the case directly to a trial court or either party can file a request to waive arbitration. Unless the only issue in the claim is lack of informed consent, a claimant must file a CQE to advance to arbitration or obtain a waiver. The function of the HCMCA is to screen out spurious medical malpractice claims and allow non-frivolous claims to be sent to arbitration or to permit a waiver of arbitration after a CQE has been filed. The statute does not function to determine the admissibility of expert testimony at trial.

The HCMCA anticipates that CQEs may be filed by health care professionals who are not physicians and no provision of the subtitle mandates that, to render an opinion in a CQE, a health care provider must be qualified to make a certain type of diagnosis. To attest in a CQE, the statute requires that a health care provider must satisfy two basic criteria: (1) generally, the health care provider must have experience, provided consultation, or taught medicine in the defendant's specialty or a related field within 5 years of the act or omission

giving rise to the cause of action, see CJ § 3-2A-02(c)(2); and (2) the health care provider may not have devoted more than 25% of the provider's professional activities to activities that directly involve testimony in personal injury claims during the 12 months immediately before the date when the claim was first filed, see CJ § 3-2A-04(b)(4)(ii). In addition, the HCMCA provides that a health care provider cannot be liable unless it is established that the health care provider's conduct was not in accordance with the standards of practice of health care providers of the same health care profession with similar training and experience situated in the same or similar communities as the defendant at the time of the alleged act giving rise to the cause of action. See CJ § 3-2A-02(c)(1). This provision requires that, to attest in a CQE, a health care provider must not only have similar training or experience as a defendant but must also have obtained the training and experience in the same or a similar community where the defendant was situated at the time of the alleged act.[2]

To ascertain whether the CQE filed by the Robinsons satisfies the requirements of the HCMCA, one would begin by examining the plain language of the statute. The goal in statutory construction "is to ascertain and effectuate the actual intent of the General Assembly." Johnson v. Md. Dep't of Health, 470 Md. 648, 674, 236 A.3d 574, 588 (2020) (citation omitted). In interpreting a statute, we first examine the plain meaning of the statutory language. See id. at 674, 236 A.3d at 588. "If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry

_____

[2]The locality requirement of CJ § 3-2A-02(c)(1) is not at issue in this case.

ordinarily comes to an end, and we apply the statute as written, without resort to other rules of construction." Id. at 674, 236 A.3d at 588-89 (citation omitted). The language of the HCMCA is unambiguous with respect to the qualifications necessary for a health care provider to attest in a CQE and the content of a CQE.

CJ § 3-2A-01(f)(1) defines a health care provider as

a hospital, a related institution as defined in § 19-301 of the Health--General Article, a medical day care center, a hospice care program, an assisted living program, a freestanding ambulatory care facility as defined in § 19-3B-01 of the Health--General Article, a physician, a physician assistant, an osteopath, an optometrist, a chiropractor, a registered or licensed practical nurse, a dentist, a podiatrist, a psychologist, a licensed certified social worker-clinical, and a physical therapist, licensed or authorized to provide one or more health care services in Maryland.

CJ § 3-2A-02(a)(1) provides, among other things, that all claims against health care providers "in which damages of more than the limit of the concurrent jurisdiction of the District Court are sought" are governed by the HCMCA. CJ § 3-2A-02(c)(1) states:

In any action for damages filed under this subtitle, the health care provider is not liable for the payment of damages unless it is established that the care given by the health care provider is not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action.

CJ § 3-2A-02(c)(2)(ii) contains two subparagraphs that state:

1. In addition to any other qualifications, a health care provider who attests in a certificate of a qualified expert or testifies in relation to a proceeding before a panel or court concerning a defendant's compliance with or departure from standards of care:

A. Shall have had clinical experience, provided consultation relating to clinical practice, or taught medicine in the defendant's specialty or a related field of health care, or in the field of health care in which the defendant provided care or treatment to the plaintiff, within 5 years of

- 5 -

the date of the alleged act or omission giving rise to the cause of action; and

B. Except as provided in subparagraph 2 of this subparagraph, if the defendant is board certified in a specialty, shall be board certified in the same or a related specialty as the defendant.[3]

2. Subparagraph 1B of this subparagraph does not apply if:

A. The defendant was providing care or treatment to the plaintiff unrelated to the area in which the defendant is board certified; or

B. The health care provider taught medicine in the defendant's specialty or a related field of health care.

CJ § 3-2A-03(a) establishes the Health Care Alternative Dispute Resolution Office ("HCADRO") as a unit of the Executive Department and states that the Office is to be headed by a Director appointed by the Governor with the advice and consent of the Senate. CJ § 3-2A-03(c)(1) also states that the Director shall prepare a list of qualified persons willing to serve as arbitrators of health care malpractice claims.

CJ § 3-2A-04 is titled "Claims filed with Director; selection of arbitrators." CJ § 3-2A-04(b)(1) states:

(i) 1. Except as provided in item (ii) of this paragraph, a claim or action filed after July 1, 1986, shall be dismissed, without prejudice, if the claimant or plaintiff fails to file a certificate of a qualified expert with the Director attesting to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury, within 90 days from the date of the complaint; and

2. The claimant or plaintiff shall serve a copy of the certificate on all other parties to the claim or action or their attorneys of record in accordance with the Maryland Rules; and

---

[3]This is the peer-to-peer requirement. <u>See</u> Maj. Slip Op. at 6, 29.

- 6 -

(ii) In lieu of dismissing the claim or action, the panel chairman or the court shall grant an extension of no more than 90 days for filing the certificate required by this paragraph, if:

1. The limitations period applicable to the claim or action has expired; and

2. The failure to file the certificate was neither willful nor the result of gross negligence.

CJ § 3-2A-04(b)(4) provides:

(i) In this paragraph, "professional activities" means all activities arising from or related to the health care profession.

(ii) A health care provider who attests in a certificate of a qualified expert or who testifies in relation to a proceeding before an arbitration panel or a court concerning compliance with or departure from standards of care may not have devoted more than 25% of the expert's professional activities to activities that directly involve testimony in personal injury claims during the 12 months immediately before the date when the claim was first filed.[4]

(iii) Once a health care provider meets the requirements of subparagraph (ii) of this paragraph, the health care provider shall be deemed to be a qualified expert as to subparagraph (ii) of this paragraph during the pendency of the claim.

(iv) If a court dismisses a claim or action because a qualified expert failed to comply with the requirements of this subsection, unless there is a showing of bad faith, a party may refile the same claim or action before the later of:

1. The expiration of the applicable period of limitation; or
2. 120 days after the date of the dismissal.

(v) A claim or an action may be refiled under subparagraph (iv) of this paragraph only once.

CJ § 3-2A-05 sets forth the arbitration proceedings to be used to determine liability.

CJ § 3-2A-06 governs the procedures for rejection of an award of arbitration.

---

[4] This is the "25 percent rule." See Maj. Slip Op. at 5-6.

CJ § 3-2A-06A sets forth, among other things, a procedure for the mutual waiver of arbitration. CJ § 3-2A-06B sets forth the process by which either a claimant or defendant may waive arbitration, without the agreement of the other party. CJ § 3-2A-06B(b)(1) states:

> Subject to the time limitation under subsection (d) of this section, any claimant may waive arbitration at any time after filing the certificate of qualified expert required by § 3-2A-04(b) of this subtitle by filing with the Director a written election to waive arbitration signed by the claimant or the claimant's attorney of record in the arbitration proceeding.

CJ § 3-2A-06B(c)(1) similarly states:

> Subject to the time limitation under subsection (d) of this section, any defendant may waive arbitration at any time after the claimant has filed the certificate of qualified expert required by § 3-2A-04(b) of this subtitle by filing with the Director a written election to waive arbitration signed by the defendant or the defendant's attorney of record in the arbitration proceeding.

Under CJ § 3-2A-06B(d)(1), "[a] waiver of arbitration by any party under this section may be filed not later than 60 days after all defendants have filed a certificate of qualified expert under § 3-2A-04(b) of this subtitle." CJ § 3-2A-06C sets forth the procedures governing alternative dispute resolution of health care malpractice claims under the HCMCA. CJ § 3-2A-06D requires, among other things, that a party must file a supplemental CQE after discovery is complete.

CJ § 3-2A-07 concerns when the arbitration panel may require a party to pay the adverse party's costs, expenses, and attorney's fees. CJ § 3-2A-08 prohibits the admission of evidence of any advanced insurance payment made for damages until there is an award or verdict, and then provides for the procedure relating to payment or adjustment of the award. CJ § 3-2A-08A sets forth the procedure by which a party to an action for a medical

- 8 -

injury may serve, accept, or withdraw an offer of judgment. CJ § 3-2A-09 provides that an award or verdict for noneconomic damages under the HCMCA may not exceed a certain limit—a limit that increases each year. CJ § 3-2A-09 also concerns verdicts for past medical expenses. Finally, CJ § 3-2A-10 states that

> [e]xcept as otherwise provided in §§ 3-2A-08A and 3-2A-09 of this subtitle, the provisions of this subtitle shall be deemed procedural in nature and may not be construed to create, enlarge, or diminish any cause of action not heretofore existing, except the defense of failure to comply with the procedures required under this subtitle.

In this case, the Robinsons filed a CQE, Canton Harbor elected to waive arbitration, and the case was transferred to the circuit court, where the Robinsons filed their complaint. In the circuit court, Canton Harbor filed a motion to dismiss, alleging that Nurse Jones-Singh was not qualified to attest to the proximate cause of Mr. Robinson's medical injuries. In a memorandum of points and authorities in support of the motion to dismiss, Canton Harbor asserted that any expert opinion attested to in a CQE and report must comply with Maryland Rule 5-702, which governs admissibility of expert testimony at trial, and that the critical question was whether Nurse Jones-Singh as a registered nurse is "qualified to opine on the issue of medical causation." Based on the plain language of the HCMCA, this is clearly wrong, for at least two reasons. First, the HCMCA requires that the expert render an opinion concerning a breach of the standard of care and proximate cause. The term "medical causation" is not used anywhere in the HCMCA. And, second, once an expert meets the credential requirements set forth in the HCMCA, *i.e.*, once it is determined that the expert has not devoted more than 25% of the expert's professional activities in the last year to serving as an expert, that the expert has experience, provided consultation, or taught

medicine in a field similar to that of the defendant within 5 years of the date of the event giving rise to the cause of action, and that the expert obtained the training and experience in the same or a similar community where the defendant was situated at the time of the alleged act, the expert may render an opinion in a CQE as to the applicable standard of care and proximate cause.

The motion to dismiss was based on two faulty premises: (1) that the CQE must comply with Maryland Rule 5-702; and (2) that to render an opinion in a CQE, Nurse Jones-Singh must be qualified to render an opinion on medical causation, which Canton Harbor equated with the ability to render a medical diagnosis. The transcript of the hearing on the motion to dismiss shows that, ruling from the bench, the circuit court determined that, based on Md. Code Ann., Health Occ. (1981, 2021 Repl. Vol.) ("HO") §§ 14-101(o) and 8-101(o) as well as Code of Maryland Regulation ("COMAR") 10.27.09.01B(16), the CQE was defective because a registered nurse cannot make a medical diagnosis and therefore cannot determine a medical condition or the cause of a condition.[5] The circuit court's entire ruling was as follows:

> Having considered the motion, the opposition and the argument presented today, I have the following ruling for you.
> The issued involved in this matter is whether a registered nurse can serve as a qualified expert under Maryland Code Courts and Judicial Proceedings section 3-2A-04(b)(1)([i]). The Court finds that the Plaintiff's designated expert Ms. Jones-Sing[h] is a healthcare provider as -- that's defined under Courts and Judicial Proceedings section 3-2A-01(f)(1). The

---

[5]HO § 14-101(o) defines the term "practice medicine." HO § 8-101(o) defines the term "practice registered nursing." COMAR 10.27.09.01B(16) defines the term "nursing diagnosis" as "a description of the actual or potential, overt or covert health problems which registered nurses are licensed to treat."

Court further finds that she is qualified to attest to the standard of care and deviation there for nurses.

However, when considering Maryland Code Health Occupations 14-101(o) and 8-101(o) as well as COMAR section 10.27.09.01.B(16), the Court finds that a registered nurse cannot make a medical diagnosis, and therefore, cannot determine a medical condition nor the cause of a condition. Therefore, the Court concludes that a registered nurse cannot attest that there was a departure from the standard of care that's the proximate cause of the alleged injury as required by Courts and Judicial Proceedings section 3-2A-04(b)(1)([i]).

As such, the Court finds that the certificate of qualified expert is defective. And Courts and Judicial Proceedings section 3-2A-04(b)(1)([i]) mandates dismissal. Furthermore, the Court finds that there is -- there has been no showing of good cause for an extension of time. And therefore, the Court will not grant such. So the Court is going to enter an order of dismissal of this matter for those reasons.

The circuit court concluded that a registered nurse cannot attest that there was a departure from the standard of care that is the proximate cause of the alleged injury as required by CJ § "3-2A-04(b)(1)([i])." This is clearly a determination that reads requirements into the HCMCA that do not exist. Aside from circuit court's ruling being inconsistent with the plain language of the provisions concerning the criteria that a health care provider must satisfy to attest as an expert in a CQE and what a qualified expert may attest to, as explained, CJ § 3-2A-10, titled "Construction of subtitle," states that the provisions of the HCMCA shall be deemed procedural in nature and may not be construed to create, enlarge, or diminish any cause of action, except the defense of the failure to comply with the procedures required under the HCMCA. This provision forecloses any argument that a court can incorporate the standards of Maryland Rule 5-702 or Rochkind v. Stevenson, 471 Md. 1, 236 A.3d 630 (2020), as a basis for finding that a CQE does not meet the requirements of the HCMCA. Moreover, the head of HCADRO is a Director

appointed by the Governor and the Office is part of the executive branch of the government. It is not the function of the Director or HCADRO to determine the admissibility of evidence under Maryland Rule 5-702 or Rochkind or whether a health care provider can make a particular type of diagnosis.

I would hold that, in all respects, Nurse Jones-Singh's credentials satisfy the requirements of the HCMCA for her to attest in a CQE concerning a breach of the standard of care and proximate cause with respect to injuries allegedly caused by nursing staff of Canton Harbor. Nurse Jones-Singh met the peer-to-peer and 25 percent requirements for attesting to breaches of the standard of care by nursing staff at Canton Harbor. Stated otherwise, Nurse Jones-Singh met the requirements set forth in the HCMCA for a health care provider to render an opinion in a CQE. With her qualifications established, in her CQE and report, Nurse Jones-Singh attested that breaches of standards of care by Canton Harbor's nursing staff were the proximate cause of Mr. Robinson's bedsores. We have stated that although the CQE filing requirement is important to the HCMCA, the Act's filing provisions do not establish, deny, or define a cause of action, nor do the provisions define the standard of care applied or prescribe how liability is determined. See Lewis v. Waletzky, 422 Md. 647, 665, 31 A.3d 123, 134 (2011). Rather, the filing provisions, as part of a legislative scheme, are simply intended to control access to Maryland courts. See id. at 134, 31 A.3d at 665.

There is nothing in the HCMCA that permits a determination by the HCADRO as to whether an expert who meets all of the qualifications of the subtitle is otherwise qualified to render an opinion about proximate cause with respect to a specific diagnosis or injury.

- 12 -

Once the parties enter arbitration or a party individually or the parties mutually waive arbitration and proceed in the circuit court, such a determination may be made by the arbitration panel or the court with respect to the admissibility of the expert's testimony at trial. See Kearney v. Berger, 416 Md. 628, 652-53, 7 A.3d 593, 607 (2010) ("[T]he HCADRO or trial court accepts the assertions in the certificate, just as courts accept a plaintiff's well-pleaded facts and allegations in a complaint. . . . At the early stage when the certificate is filed, neither the HCADRO nor the trial court is in a position to make determinations about the strength of the expert's opinions. Those determinations arise later." (Citation omitted)). The HCADRO serves as a screener of claims charged with assuring that an expert with similar qualifications as a defendant has reviewed the circumstances of a case and attested to a breach of the applicable standard of care and proximate cause, not a judge or fact finder with respect to an expert's qualifications to render a specific diagnosis, which is a determination that is governed by Maryland Rule 5-702.

In determining that Nurse Jones-Singh's CQE satisfies the requirements of the HCMCA, the Majority concludes:

> Two points are central to our analysis. First, where a patient has previously been diagnosed with a particular medical injury by another health care provider, a registered nurse who relies on that pre-existing diagnosis does not make a diagnosis concerning the injury itself in a certificate filed under the Act. Rather, the nurse accepts the accuracy of the pre-existing diagnosis made by another health care provider(s). A different situation arises where a registered nurse purports to diagnose a medical condition or other medical injury in the first instance in a certificate.

> Second, a registered nurse does not exceed the bounds of nursing practice when the nurse opines in a certificate that a departure from the

- 13 -

standards of nursing care is the proximate cause of a previously diagnosed pressure ulcer that developed while the patient resided at a skilled nursing facility.

Maj. Slip Op. at 23.

The Majority states that "it is at least an open question whether identifying the proximate cause of a pressure ulcer is within the proper scope of rendering a nursing diagnosis and does not constitute or require making a medical diagnosis[,]" and that a registered nurse may be qualified to render an opinion in a CQE "that breach of applicable standards of nursing care for preventing and treating decubitus ulcers proximately caused the plaintiff's ulcer injury" with the following qualification:

> Because a registered nurse cannot render an opinion on medical causation, we add the qualification that the patient's pressure ulcer must have been previously diagnosed by another qualified health care provider, unless the certifying registered nurse, in the course of personally examining the patient, observed the wound and identified it as a pressure ulcer. If a registered nurse knows (based on a pre-existing diagnosis) that the patient developed a pressure ulcer while a resident of a skilled nursing facility, the nurse may be qualified to attest in a certificate that a breach of the applicable standard of nursing care is the proximate cause of the pressure ulcer.

Maj. Slip Op. at 27-28 (footnote omitted).

Although the majority opinion states that Maryland Rule 5-702 will only be relevant in determining whether Nurse Jones-Singh's opinions are admissible at trial if she is called as an expert witness, see Maj. Slip Op. at 33-34, in determining that Nurse Jones-Singh's CQE meets the requirements of the HCMCA because she did not make a medical diagnosis and instead relied on a previous diagnosis made by another health care provider, see Maj. Slip Op. at 22-23, the Majority in essence is making a determination about Nurse Jones-Singh's qualifications as an expert under Maryland Rule 5-702 and opining as to whether

- 14 -

Nurse Jones-Singh has the knowledge, skill, experience, training, or education necessary to diagnose whether a patient had bedsores.[6] Nothing in the HCMCA permits the HCADRO, or a trial court for that matter, in determining whether a CQE meets the requirements of the Act, to assess whether a health care provider is qualified to make a particular diagnosis or to render an opinion in a CQE about a particular diagnosis. The Majority's holding reaches a conclusion not implicated by the HCMCA and holds Nurse Jones-Singh's qualifications to a standard which exceeds that authorized by the Act.

Aside from the plain language of the HCMCA not authorizing the inquiry the Majority undertakes, as a practical matter, the HCADRO, which is a unit in the Executive Department headed by the Director, is not equipped to schedule the filing of memoranda, hold contested hearings, and issue rulings as to whether health care providers who submit CQEs are qualified under Maryland Rule 5-702, or authorized under COMAR, to render an opinion about a particular type of diagnosis. The parties may of course challenge

---

[6]In addition, the Majority's determination is inconsistent with case law concerning the admissibility of expert testimony at trial. The Majority concludes that, for a nurse to attest in a CQE about the proximate cause of a pressure ulcer, the diagnosis of the pressure ulcer must have been made by "another qualified health care provider" unless the nurse has personally examined the patient and identified the existence of a pressure ulcer. Maj. Slip Op. at 28. In other words, the Majority concludes that a nurse may not review nursing notes and reports concerning a patient's condition and render an opinion as an expert that the person has a pressure ulcer, *i.e.*, a bedsore. Aside from addressing an issue that is not at all part of the HCMCA, the Majority's holding also contradicts the well-established principle that, to render an opinion as an expert, a witness need not have personally treated or examined the person at issue. See Levitas v. Christian, 454 Md. 233, 251, 164 A.3d 228, 239 (2017) (We rejected the defendant's contention that an expert's opinion lacked a sufficient factual basis because the expert did not conduct his own examination of the plaintiff and instead relied on another expert's report, scientific research, school records, discovery materials, and deposition testimony.).

whether a health care provider's qualifications and the content of the CQE meet the requirements of the HCMCA in court or at arbitration. As this Court stated in Kearney, 416 Md. at 653, 7 A.3d at 607:

> If the HCADRO or trial court determines that some information required by § 3-2A-04(b) is missing from the certificate, dismissal is required because the claimant or plaintiff has necessarily failed to establish that the claim has merit. In this manner, the certificate requirement allows for the weeding out of a non-meritorious claim. If the certificate includes the information that § 3-2A-04(b) requires, then the claimant or plaintiff has shown that the claim may have merit and dismissal pursuant to § 3-2A-04(b) is inappropriate. At the early stage when the certificate is filed, neither the HCADRO nor the trial court is in a position to make determinations about the strength of the expert's opinions. Those determinations arise later. In further proceedings, the defendant may challenge the expert's opinions on the basis that they are not expressed to a reasonable degree of medical probability.

(Paragraph break omitted).

Although the parties may challenge a health care provider's qualifications and the content of a CQE in court, the HCMCA contemplates that the Director or the HCADRO will review the qualifications of the health care provider and the CQE to determine whether they meet the requirements of the Act. CJ § 3-2A-04(b)(1)(i)1 states:

> Except as provided in item (ii) of this paragraph, a claim or action filed after July 1, 1986, shall be dismissed, without prejudice, if the claimant or plaintiff fails to file a certificate of qualified expert with the Director attesting to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury, within 90 days from the date of the complaint[.]

This provision makes clear that it is within the province of the Director or HCADRO to determine whether a claim should be dismissed for a claimant's failure to timely file a CQE that complies with the requirements of the Act. Likewise, CJ § 3-2A-04(b)(2)(i) provides that

- 16 -

> [a] claim or action filed after July 1, 1986, may be adjudicated in favor of the claimant or plaintiff on the issue of liability, if the defendant disputes liability and fails to file a certificate of qualified expert attesting to compliance with standards of care, or that the departure from standards of care is not the proximate cause of the alleged injury, within 120 days from the date the claimant or plaintiff served the certificate of qualified expert set forth in paragraph (1) of this subsection on the defendant.

Again, this language makes clear that it is the duty of the Director or HCADRO to make a determination as to whether a claim should be dismissed due to a defendant's failure to timely file a CQE that complies with the requirements of the Act. Moreover, CJ § 3-2A-04(b)(4)(iii) provides that, "[o]nce a health care provider meets the requirements of subparagraph (ii)[7] of this paragraph, the health care provider shall be deemed to be a qualified expert as to subparagraph (ii) of this paragraph during the pendency of the claim." This language unequivocally states that upon satisfaction of the additional professional activity requirement[8] set forth in the statute, a health care provider shall be deemed a qualified expert during the pendency of the claim. The majority opinion sets forth additional requirements about a health care provider's qualifications and the content of a CQE that HCADRO is not required to screen for and will not be equipped to screen for, which will result in the HCMCA being meaningless with respect to the Director's or HCADRO's review of the new requirements imposed by the Majority.[9]

---

[7]Subparagraph (ii) of CJ § 3-2A-04(b)(4) sets forth the requirement that a health care provider may not have devoted more than 25% of the expert's professional activities to activities that involve testimony in personal injury claims during the 12 months that immediately precede the filing of the instant claim.

[8]The peer-to-peer requirement is set forth earlier in CJ § 3-2A-02(c)(2)(ii)1.

[9]In Kearney, 416 Md. at 652-53, 7 A.3d at 607, in rejecting a doctor's argument that a CQE must contain opinions expressed to a reasonable degree of medical probability, we

- 17 -

Although the Majority concludes that Nurse Jones-Singh's CQE is acceptable, its analysis permits a trial court to dismiss a case based on a finding that a CQE does not meet the requirements of the HCMCA because the attesting health care provider, a nurse, or potentially another type of health care provider, is not qualified to make a particular diagnosis or to render an opinion about proximate cause, even though the health care provider has otherwise satisfied the requirements of the Act and the CQE was accepted by the HCADRO. The majority opinion incorporates into the HCMCA a requirement that does not exist and one that the HCADRO is not prepared to screen for or make a determination about. As explained, to attest in a CQE, a health care provider must have experience, provided consultation, or taught medicine in the defendant's specialty or a related field within 5 years of the act or omission giving rise to the cause of action, see CJ § 3-2A-02(c)(2), and may not have devoted more than 25% of the provider's professional activities to activities that directly involve testimony in personal injury claims during the 12 months immediately before the date when the claim was first filed, see CJ § 3-2A-

explained that a claimant or plaintiff is not required to prove their case with the CQE and as explained above, we stated, among other things, that, "[i]f the HCADRO or trial court determines that some information required by § 3-2A-04(b) is missing from the certificate, dismissal is required because the claimant or plaintiff has necessarily failed to establish that the claim has merit." In addition, in concluding that the trial court did not abuse its discretion in concluding that there was no good cause to extend the deadline for filing the CQE, we also remarked that "[n]othing in the HCMCA instructs the Director to evaluate the certificate, and [p]etitioners have presented nothing to suggest that that the Director actually represented to them that the certificate was sufficient." Id. at 664, 7 A.3d at 614. This remark in Kearney does not definitively resolve what level of review the HCADRO is responsible for with respect to the qualifications of a health care provider who attests in a CQE and the content of the CQE. The statute speaks for itself that the HCADRO or Director shall make a determination as to whether the CQE was timely submitted and contains the required information.

04(b)(4)(ii). In addition, the health care provider must have obtained training and experience in the same or a similar community where the defendant was situated at the time of the alleged act. See CJ § 3-2A-02(c)(1). These are easily verifiable criteria and do not require the HCADRO or trial court to address whether a witness is qualified as an expert by knowledge, skill, experience, training, or education to make a medical diagnosis or to otherwise opine about proximate cause where a particular diagnosis is concerned.

Nothing in the HCMCA permits the HCADRO to deny a waiver of arbitration, apart from the requirements of the statute concerning an expert's credentials, the required content of a CQE, and a time limit violation in filing an election to waive arbitration, an issue that was not raised in this case. Once an expert has met the qualifications set forth in the statute, it is not the HCADRO's function to determine whether an expert is qualified to render an opinion at trial on proximate cause with respect to a specific injury or diagnosis.[10] At the point that a health care provider submits a CQE, the HCADRO accepts the assertions in the CQE, without determining whether the health care provider would be permitted to

---

[10]All of the Majority's concerns as to whether a nurse can make a medical diagnosis, whether Nurse Jones-Singh in particular is qualified to diagnose bedsores, and the application of COMAR to Nurse Jones-Singh's testimony are issues to be addressed by the circuit court if or when raised in a motion to exclude Nurse Jones-Singh's testimony at trial based on Maryland Rule 5-702, Rochkind, and Daubert, or other grounds for exclusion of expert testimony. Nothing in an opinion from this Court holding that Nurse Jones-Singh's CQE satisfies the requirements of the HCMCA (which it does) would preclude Canton Harbor from raising the exclusion of expert testimony type issues it attempted to have reviewed under the HCMCA in a motion based on grounds for excluding expert testimony at trial. Concluding that a health care provider is not qualified to render an opinion in a CQE because the health care provider is not qualified to make a medical diagnosis or to diagnose a particular condition is not a determination that is authorized under the HCMCA.

testify as an expert under Maryland Rule 5-702. See Kearney, 416 Md. at 652-53, 7 A.3d at 607.

By virtue of the requirement that a health care provider who attests in a CQE have similar credentials in terms of experience as the defendant, it stands to reason that a registered nurse, with proper credentials, will meet the qualifications to render an opinion in a CQE about the conduct of other nurses, who have the same experience, training, or consultation background as the nurse. Whether the nurse is qualified to testify about a certain diagnosis is a determination left to the trial court under Maryland Rule 5-702. This is the role of the trial court as the gatekeeper with respect to expert testimony at trial.

If a court dismisses a claim or action because a CQE failed to comply with the requirements of this subsection, unless there is a showing of bad faith, a party may refile the same claim or action before the later of the expiration of the statute of limitations or 120 days after the dismissal. See CJ § 3-2A-04(b)(4)(iv). This provision demonstrates that the goal of the HCMCA is not to dismiss claims for lack of admissibility of expert testimony at trial but to permit non-frivolous claims an opportunity to be pursued, while weeding out frivolous claims.[11]

---

[11]As an aside, this Court's holding in Carroll, 400 Md. at 172, 929 A.2d at 22, that a CQE, among other things, must identify the defendant by name does not apply in this case. Carroll and other cases like it either involved claims with multiple defendants who were not specifically identified in a CQE or claims in which a certificate referred only to the "defendant" without identifying or referencing the defendant named in the claim at issue. In Carroll, 400 Md. at 196-97, 929 A.2d at 37, the expert's report included the names of five different physicians, two of whom were the named defendants in the case. The report mentioned the two named defendants but also mentioned two unnamed physicians and identified a third physician who was not a defendant in the case. See id. at 197, 929

For the above reasons, respectfully, I concur.

---

A.2d at 37. We stated that in so doing, the expert "failed to state with sufficient specificity which physician or physicians breached the standard of care and which physician or physicians were allegedly responsible for Carroll's injuries[,]" and failed to state what the standard of care was or how the named defendant departed from it. Id. at 197, 929 A.2d at 37.

In Carroll, 400 Md. at 195-96, 929 A.2d at 36-37, we held that the CQE must identify the defendant who allegedly breached the standard of care and must allege that the defendant departed from an applicable standard of care. In this case, the Robinsons filed a complaint identifying Canton Harbor Healthcare Center, Inc., d/b/a Future Care-Canton Harbor as the defendant. CJ § 3-2A-01(f)(1) states a health care provider means, among others, a hospital, a related institution as defined in Md. Code Ann., Health-Gen. ("HG") § 19-301, a medical day care center, a hospice care program, an assisted living program, and a freestanding ambulatory care facility as defined in HG § 19-3B-01. HG § 19-301(f) defines the term "hospital" and HG § 19-301(l) states "nursing facility" "means a related institution that provides nursing care for 2 or more unrelated individuals." In the report incorporated into the CQE in this case, Nurse Jones-Singh stated that it was her opinion to a reasonable degree of medical certainty that "Future Care of Canton Harbor breached the standard of care for skilled nursing facilities/post-acute rehabilitation." Nurse Jones-Singh's report indicated that Canton Harbor's nursing staff, not an unidentified health care provider or a health care provider that was unnamed as a defendant, breached the applicable standard of care and the breach was the proximate cause of Mr. Robinson's injuries. Nurse Jones-Singh's CQE comports with the requirements set forth in Carroll.

- 21 -

Circuit Court for Baltimore City
Case No.: 24-C-22-001200
Argued: January 7, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 22

September Term, 2024

CANTON HARBOR HEALTHCARE
CENTER, INC.

v.

FELICIA ROBINSON, ET AL.

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

Concurring and Dissenting Opinion
by Booth, J., which Eaves and Killough, JJ., join.

Filed: July 29, 2025

With respect to the Plurality's opinion, I respectfully concur in part, and dissent in part. I agree with the Plurality that a registered nurse cannot attest in a certificate of qualified expert to the standard of care applicable to a physician or that the physician departed from that standard of care. Plurality Slip Op. at 29. I also agree that the plaintiff's registered nurse expert, Anjanette Jones-Singh, is a "health care provider" under § 3-2A-01(f)(1) of the Courts and Judicial Proceedings ("CJ") Article (2020 Repl. Vol.) of the Maryland Annotated Code and is qualified to attest to the breach of the standard of care for nurses. However, I disagree that the record establishes that Nurse Jones-Singh was qualified in this case to attest "that the departure from [the] standards of care is the proximate cause of the alleged injury" as required by CJ § 3-2A-04(b)(1)(i).

Concerning the issue of whether identifying the proximate cause of a pressure ulcer is within the proper scope of rendering a nursing diagnosis, the Plurality sidesteps this issue by citing to the Appellate Court opinion and observing that "it is at least an open question[.]" Plurality Slip Op. at 27 (citing *Robinson v. Canton Harbor Health Care, Inc.*, 261 Md. App. 560, 587 (2024)). Because I would not conclude on this record that identifying the proximate cause of a pressure ulcer does not involve a medical diagnosis, I would reverse the judgment of the Appellate Court. Moreover, even if Nurse Jones-Singh was qualified to render an opinion on proximate cause, her certificate was insufficient as a matter of law.

# I

## Facts and Procedural History

Mr. Everett Robinson's illness and death were tragic. Mr. Robinson was transferred to Canton Harbor from Johns Hopkins Hospital for follow up care after Mr. Robinson had suffered a stroke. He developed decubitus ulcers and died in March 2019.

Two years later, in March 2021, Plaintiff, Felicia Robinson, individually and as the Personal Representative of the Estate of Everett B. Robinson, filed a claim against the defendant, Canton Harbor Healthcare Center, Inc., d/b/a FutureCare-Canton Harbor ("Canton Harbor"), a skilled nursing facility, in Maryland's Health Care Alternative Dispute Resolution Office ("HCADRO"), in which she alleged medical negligence.[1]

Plaintiff's certificate of qualified expert ("certificate") was due no later than June 2021—but none was filed. On September 3, 2021, Plaintiff filed a second request for an extension of time to submit her certificate because she only had an expert on standard of care and needed a causation expert. The only certificate Plaintiff ultimately submitted, however, was from Nurse Anjanette Jones-Singh, who reviewed Mr. Robinson's medical records and opined that Canton Harbor "breached the standard of care and the breach was the proximate cause of Mr. Robinson's injuries[.]"

---

[1] The complaint, as filed, also included a wrongful death claim filed on behalf of the decedent and Mr. Robinson's daughter and sons. Before the Circuit Court for Baltimore City, counsel for Plaintiff advised that they were not pursuing the wrongful death claim, stating: "[w]e are abandoning that and limiting it to the cause in the decubitus ulcers, the treatment and care that needed to be – to address that issue and the medical expenses associated with that."

Plaintiff's complaint alleged the following:

- During his admission, Mr. Robinson developed left leg ulcers that were brought to the attention of the facility and should have been properly treated and cared for.

- The bedsores were allowed to develop and spread to the buttocks area as well as the inner thigh.

- As a direct and proximate cause of Canton Harbor's neglect, the areas became infected and Mr. Robinson was transferred to "other facilities," where he received further treatment and care.

- Mr. Robinson's condition worsened, and he became septic and died.

- Canton Harbor breached the standard of care by failing to: properly turn Mr. Robinson; perform proper skin checks; and respond to the complaint about pressure ulcers. Canton Harbor was also otherwise negligent.

- As a direct and proximate result of Canton Harbor's neglect, Mr. Robinson suffered pain, incurred medical bills, and his estate incurred funeral bills.

Canton Harbor filed a motion to dismiss the complaint, contending that the certificate filed by Plaintiff was deficient because, as a registered nurse, Nurse Jones-Singh was not qualified to attest to the proximate cause of Mr. Robinson's medical injuries. After a hearing in which the circuit court considered the motion and Plaintiff's opposition, the court granted Canton Harbor's motion to dismiss. Although the court noted that Nurse Jones-Singh was qualified to attest to the standard of care and any deviation from that standard for nurses, the court found that "a registered nurse cannot make a medical diagnosis, and[,] therefore, cannot determine a medical condition nor the cause of a condition." "Therefore," the circuit court concluded, "a registered nurse cannot attest that

3

there was a departure from the standard of care [that is] the proximate cause of the alleged injury" as required by CJ § 3-2A-04(b)(1)(i).

We review the sufficiency of a certificate de novo. *See Carroll v. Konits*, 400 Md. 167, 180 & n.11 (2007); *see also Jordan v. Elyassi's Greenbelt Oral & Facial Surgery, P.C.*, 256 Md. App. 555, 567 (2022). Similarly, "[w]hen reviewing the grant of a motion to dismiss, the appropriate standard of review 'is whether the trial court was legally correct.'" *D.L. v. Sheppard Pratt Health Sys., Inc.*, 465 Md. 339, 350 (2019) (quoting *Blackstone v. Sharma*, 461 Md. 87, 110 (2018)). Therefore, "[w]e will affirm the circuit court's judgment 'on any ground adequately shown by the record, even one upon which the circuit court has not relied or one that the parties have not raised.'" *Id.* (quoting *Sutton v. FedFirst Fin. Corp.*, 226 Md. App. 46, 74 (2015), *cert. denied*, *Sutton v. FedFirst Fin.*, 446 Md. 293 (2016)). *See also J. I. Case Credit Corp. v. Insley*, 293 Md. 483, 487 (1982) ("The settled rule is that an appellate court will ordinarily affirm a trial court's judgment on any ground adequately shown by the record (and even though the ground was not relied on by the trial court).").

For the reasons that I will more fully explain herein, Nurse Jones-Singh's certificate was insufficient as a matter of law.

## II

### Nurse Jones-Singh's Certificate and Report

#### A. Nurse Jones-Singh's Qualifications

In her initial certificate, Nurse Jones-Singh stated that she was a registered nurse who was "familiar with and knowledgeable of the standards of care applicable to the

4

treatment and care of an individual under the circumstances of the treatment and care as provided to Everette Robinson in this matter." In an affidavit that appears to have been attached to Plaintiff's opposition to Canton Harbor's motion to dismiss, Nurse Jones-Singh asserted that she had been a registered nurse for over 16 years, during which time she had "routinely perform[ed] skin evaluations on [her] patients, identified pressure ulcers, classified the staging of each ulcer and proposed a treatment and care plan to heal the ulcer" for more than "500 patients." She maintained that she had "worked as a wound care nurse . . . at Arcola Nursing and Rehabilitation Center" from 2006–2008, and she claims to have "*routinely diagnosed the cause* of pressure ulcers" during that time. (Emphasis added).

Nurse Jones-Singh declared that, as "a long-term care Director of Nursing and Resident Assessment Coordinator[,]" she had "received annual updates in the field of wound care and pressure ulcers" and was "abundantly qualified by background, education and experience to address the issues as to whether Mr. Robinson's treatment was within the standard of care and whether the failure to comply with the standard caused him injury, which it did, in the form of a pressure ulcer."

Nurse Jones-Singh stated that she reviewed the relevant records, which included: an admission assessment, subsequent skin assessments, nutritional assessments, MDS,[2] care

---

[2] The "MDS" medical abbreviation stands for the "Minimum Data Set" and is a required assessment for all residents of nursing homes and skilled nursing facilities. It is part of a federally mandated process for clinical assessment of all residents in Medicare or Medicaid certified nursing homes. The process entails a comprehensive, standardized assessment of each resident's functional capabilities and health needs. Ctrs. for Medicare & Medicaid Servs., *Minimum Data Set Frequency*, Data.CMS.gov (April 8, 2025), https://perma.cc/38NX-3ZPP; *see also* 42 C.F.R. § 483.315(e); *id.* § 483.20(b)(1).

plans, physician's progress notes, nurse practitioner's notes, and wound evaluations. She described Mr. Robinson's admitting diagnoses and the various medications that were ordered upon his admission.

### B. Mr. Robinson's Admitting Diagnoses and Medications

Mr. Robinson arrived at Canton Harbor with an extensive list of existing diagnoses and medications. Nurse Jones-Singh's report lists Mr. Robinson's admitting diagnoses as: acute embolism (artery blockage), acute laryngotracheitis (respiratory infection), alcohol abuse, altered mental status, aphasia (difficulty speaking), atherosclerotic heart disease, cerebral infarction (stroke), cerebrovascular disease, cocaine abuse, dysphagia (difficulty swallowing), hypertension, hemiplegia (paralysis to one side of the body), major depressive disorder, hyperlipidemia, seizures, and tachycardia.

Mr. Robinson was ordered the following medications upon admission: aspirin, atorvastatin (cholesterol medication), fluoxetine (selective serotonin reuptake inhibitor), folic acid (vitamin B9), nicotine patch, quetiapine (adjunctive treatment for major depressive disorder), Senokot (laxative), thiamine (vitamin B1), and bromocriptine mesylate.

While at Canton Harbor, Mr. Robinson was deemed incompetent to make his own healthcare decisions, was unable to communicate effectively, and was completely dependent on others for care. He therefore heavily relied on staff to turn and reposition him, provide him with nutrition, anticipate his needs, and assist him with activities of daily living. During his stay, Mr. Robinson developed decubitus ulcers.

6

Nurse Jones-Singh noted in her report that Mr. Robinson's initial assessment indicated a surgical wound to the left side of his head, and that Canton Harbor identified him as having a high risk of developing pressure ulcers. Canton Harbor implemented various preventative measures, including float heels, turning and repositioning, barrier cream, and a pressure reducing mattress and cushion. Mr. Robinson nonetheless developed skin impairment in his sacral area on August 20, 2018, which was initially classified as Incontinence Associated Dermatitis ("IAD"). Nurse Jones-Singh stated that this impairment thereafter "declined" to a pressure ulcer, and Mr. Robinson later had a Suspected Deep Tissue Injury ("SDTI").

### C. *Expert Opinions on Breaches of the Standard of Care*

The certificate and report do not identify any individuals who are alleged to have violated the standard of care other than Mr. Robinson's primary care physician, Dr. Viray Shah. Instead, Nurse Jones-Singh's certificate lumps all of Canton Harbor's staff together and renders several opinions that unnamed physicians breached the physicians' standard of care, including failure to:

- prescribe pain medication;
- document skin alterations during nine separate assessments;
- complete an impaired skin integrity plan within 72 hours of admission; and
- prescribe an anticoagulant as an "intervention . . . to assist with tissue perfusion" or to code the patient's skin accurately.

The certificate's multiple allegations about the "facility's" alleged failures undoubtedly relate to medical treatment provided by facility physicians. Or, in other words, the certificate plainly alleges multiple breaches of the physicians' standard of care. I agree

7

with the Plurality that Nurse Jones-Singh is not qualified to render expert opinions on physicians' standards of care or alleged breaches of the standard of care.

In addition to her opinions regarding the unnamed physicians' violations of the standard of care, Nurse Jones-Singh also opined that the unnamed nurses at the facility violated the standard of care by, among other things, failing to properly: utilize a standardized pressure ulcer risk assessment tool to assess Mr. Robinson's risks for developing pressure ulcers upon his admission, and at regular intervals thereafter, inspect the skin and report any changes to the charge nurse; remove devices (such as heel booties) to assess the skin; position and reposition Mr. Robinson in a manner that reduced friction; provide incontinence care (such as applying skin cleansers and barrier creams); and following family physicians' orders.

### D. Opinions on Proximate Cause

In her report, Nurse Jones-Singh rendered classic *ipse dixit* medical opinions about the proximate cause of a significant medical injury. Specifically, she concluded that the only possible cause—and thus, the only proximate cause—of Mr. Robinson's deepening skin injury, was negligence by "Canton Harbor." First, she offered a medical opinion that IAD "cannot be the etiology of a sacral ulcer." She then opined that "a suspected deep tissue injury is damaged [sic] to the underlying skin *only caused by* friction and/or shearing." (Emphasis added). She further opined that "Canton Harbor" must have "directly caused the SDTI to the sacrum noted on Mr. Robinson as there is no other etiology for this type of wound." Nurse Jones-Singh noted that Mr. Robinson's medical records reflect that he had several cardiovascular-related comorbidities and an extensive history of

8

impaired circulation and that he was immobile with impaired tissue perfusion. Notably, however, her opinion did not mention how these issues or Mr. Robinson's other conditions or medications may have affected the development of pressure injuries, nor did she explain how she ruled these issues, conditions, and medications out as potential causes of the pressure injuries in reaching her conclusory diagnosis.

As I will discuss in more detail below, "Canton Harbor"—a facility—did not diagnose or misdiagnose any condition. That act was undertaken by one or more unnamed physicians not identified in Nurse Jones-Singh's report, in derogation of the requirements for a proper certificate and report.

Nurse Jones-Singh summarized her opinions in her report as follows:

It is my opinion to a reasonable degree of nursing certainty, that [Canton Harbor] breached the standard of care for skilled nursing facilities/post-acute rehabilitation. Their failure increased the risk of harm, in fact harm did occur as evidenced by Mr. Robinson's acquired left buttock, right buttock, and sacral ulcer with a suspected deep tissue injury.

The facts and clinical analysis in this report represent a deviation from the acceptable nursing standard of care. This includes violations of federal state regulations, which are part of the acceptable standard of care and also their own policies and procedures, which are part of the acceptable standard of care.

Because of what happened to Mr. Robinson, it was evident that there was a lack of oversight; utilization of nursing process; care planning; critical thinking and lack of urgency resulting in substandard care. These actions resulted in avoidable pressure ulcers to Mr. Robinson's left buttock, right buttock, and sacral area.

9

## III

## Medical Malpractice Cases – Expert Testimony Requirements

To prevail in a medical malpractice negligence action, a plaintiff must prove four elements: "(1) the defendant's duty based on the applicable standard of care, (2) a breach of that duty, (3) that the breach caused the injury claimed, and (4) damages." *Am. Radiology Servs., LLC v. Reiss*, 470 Md. 555, 579 (2020). It is well settled in Maryland that qualified expert testimony is necessary to establish two elements: (1) the breach of the standard of care; and (2) causation. *See id.* at 580 ("In the context of most medical malpractice cases, we have articulated that 'because of the complexity of the subject matter, expert testimony is required to establish negligence and causation.'" (quoting *Meda v. Brown*, 318 Md. 418, 428 (1990))); *see also Rodriguez v. Clarke*, 400 Md. 39, 71 (2007) ("Because the gravamen of a medical malpractice action is the defendant's use of suitable professional skill, which is generally a topic calling for expert testimony, this Court has repeatedly recognized that expert testimony is required to establish negligence and causation." (internal quotations and citations omitted)).

We require expert testimony to prove these two elements because "determinations of issues relating to breaches of standards of care and medical causation are considered to be beyond the ken of the average layperson[,]" *Reiss*, 470 Md. at 580, because they "require[] knowledge of complicated matters," such as "human anatomy, medical science, operative procedures, areas of patient responsibility, and standards of care[,]" *Orkin v. Holy Cross Hosp. of Silver Spring, Inc.*, 318 Md. 429, 433 (1990).

Maryland law requires not only that the plaintiff present expert testimony on both (1) the applicable standard of care, and (2) causation, but also that the expert testimony be held to a "reasonable degree of medical probability to ensure that the expert's opinion is more than speculation or conjecture." *Kearney v. Berger*, 416 Md. 628, 651–52 (2010) (citation modified). In other words, both elements *must* be established "to a reasonable degree of medical probability." *Id.* (citation modified). As we explained in *Reiss*, "[w]hen a medical expert is asked whether he or she holds an opinion 'to a reasonable degree of medical certainty' or 'within a reasonable degree of medical probability[,]' such 'wooden phrases are required to make sure that the expert's opinion is more than speculation or conjecture.'" 470 Md. at 581 (quoting Joseph F. Murphy, Jr., Maryland Evidence Handbook § 1404 at 649 (4th ed. 2010)). Indeed, "appellate courts have made clear that expert testimony based upon anything less than a reasonable degree of probability may be properly excluded." *Id.* (quoting *Karl v. Davis*, 100 Md. App. 42, 52–53 (1994) (citing *Pierce v. Johns-Manville Sales Corp.*, 296 Md. 656, 666 (1983); *Hines v. State*, 58 Md. App. 637, 670 (1984))). "In addition to ensuring that the opinions are based upon more than speculation or conjecture, the subsequent repetition of a phrase like 'reasonable degree of medical probability' during the testimony of key witnesses emphasizes to the jury that it is to view reasonableness through the eyes of a medical practitioner." *Id.* at 581 (quoting *Armacost v. Davis*, 462 Md. 504, 533 n.17 (2019)).

Of course, there may be rare instances in which the plaintiff is not required to establish medical negligence or causation by expert testimony. *See Meda*, 318 Md. at 428 (explaining that apart from the occasional "obvious injury" case, expert testimony is

11

generally necessary to establish negligence and causation in a medical malpractice case). When the common knowledge of laypersons is extensive enough to recognize or infer negligence from the facts, the jury may do so without the aid of expert testimony. For example, this Court has recognized that there is no need for expert testimony to show that a dentist should not pull the wrong tooth, *McClees v. Cohen*, 158 Md. 60 (1930), that a physician should not drop a scalpel or knife on a patient causing him to be cut, or drop some fluid causing him to be burned, *Johns Hopkins Hosp. v. Genda*, 255 Md. 616, 625 (1969), amputate the wrong limb or leave a foreign object in a patient's body, *Central Cab Co. v. Clarke*, 259 Md. 542, 551 (1970), or leave a patient who has been hit by an automobile unattended when the possibility of life-threatening internal injuries is obvious, *Thomas v. Corso*, 265 Md. 84, 99 (1972).

I agree with the Plurality that a registered nurse is not able to provide expert testimony concerning a medical diagnosis. Therefore, where the nature of a medical injury is such that expert testimony is necessary to establish medical causation, a nurse lacks the qualification to render an opinion on causation. Additionally, as I explain below, where a medical malpractice claim involves a medical injury for which expert testimony is required to establish medical causation, a nurse is also not qualified to provide a certificate under Maryland's Health Care Malpractice Claims Act attesting to proximate cause.

## IV

## Health Care Malpractice Claims Act

This Court and the Appellate Court have extensively discussed Maryland's Health Care Malpractice Claims Act and the legislative purpose behind its enactment, as well as

12

the amendments that followed. *See Breslin v. Powell*, 421 Md. 266, 278–86 (2011); *Carroll v. Konits*, 400 Md. 167, 176–78 (2007); *Debbas v. Nelson*, 389 Md. 364, 375–80 (2005); *DeMuth v. Strong*, 205 Md. App. 521, 538–42 (2012). I discuss some of that history here because it informs my statutory interpretation that, where the statute requires one or more certificates by a qualified health care provider establishing *both* a breach in the applicable standard of care *and* that the breach proximately caused a medical injury, a nurse is not qualified to sign a certificate attesting to the proximate cause of the medical injury where that opinion involves a medical diagnosis.

### A. Statutory History

"In the 1970's, medical malpractice insurers faced a dramatic increase in the number of malpractice suits being filed and an alarming rise in the dollar amounts of malpractice verdicts." *Debbas*, 389 Md. at 375 (citation modified). In response to the crisis, "[m]edical malpractice insurers initially responded to the dramatic rise in litigation by raising premium rates for physicians." *Id.* "When rate increases were no longer sufficient to offset the increased costs associated with defending malpractice suits, carriers began to cease underwriting medical malpractice insurance in Maryland." *Id.*

In 1975, St. Paul Fire & Marine Insurance Company ("St. Paul")—Maryland's largest malpractice insurance carrier at that time—informed the State Insurance Commissioner that it intended to withdraw from the medical malpractice market because it no longer considered the market to be profitable. *St. Paul Fire & Marine Ins. Co. v. Ins. Comm'r*, 275 Md. 130, 134 (1975). The State Insurance Commissioner issued an order proscribing St. Paul's withdrawal and requiring it to continue to provide insurance

13

coverage in Maryland. *Id.* at 135. After the Circuit Court for Baltimore City affirmed the Insurance Commissioner's order, this Court reversed, holding that the Insurance Commissioner could not require St. Paul to provide medical malpractice insurance. *Id.* at 143–44.

While the litigation was ongoing, the General Assembly responded to the insurance crisis by forming a committee to study methods of reforming the legal process of pursuing medical malpractice claims. *Debbas*, 389 Md. at 375–76; *see also Witte v. Azarian*, 369 Md. 518, 527 (2002) ("The General Assembly understood that the collapse of the malpractice insurance market was rooted, to some extent, in the manner in which malpractice claims arose and were resolved, and . . . considered a variety of proposals designed to deal with those underlying issues.").

The General Assembly passed the Health Care Malpractice Claims Act (the "Act") in 1976 to change the way in which malpractice claims were brought and resolved. *Breslin*, 421 Md. at 280; *Witte*, 369 Md. at 526. The Act "modified the existing medium in three main ways[.]" *Breslin*, 421 Md. at 280. First, it created the Health Claims Arbitration Office to facilitate and expedite the resolution of malpractice claims. *Id.* Second, "it created, through an arbitration panel, an exclusive arbitration procedure for resolving all claims over $5,000[.]" *Id.* Third, it provided that the arbitration panel's award would be nonbinding and that all awards could be rejected, and thereafter resolved by "traditional judicial actions and remedies."[3] *Id.* "The purpose of the arbitration system created by the

_____

[3] Over the course of the next two years, much litigation ensued, challenging the constitutionality of the Health Care Malpractice Claims Act (the "Act") and causing the

14

Act, and of the Act generally, was and remains to 'discourag[e] the pursuit of non-meritorious claims' by revealing the weaknesses in such cases." *DeMuth*, 205 Md. App. at 538 (quoting *Debbas*, 389 Md. at 376) (alteration in original).  The imposition of arbitration as a condition precedent to filing suit in a circuit court, however, did little to resolve the crisis.[4]  *Debbas*, 389 Md. at 377.

In 1986, the General Assembly enacted a significant amendment to the Act. 1986 Md. Laws, Ch. 640.  That amendment, codified at CJ § 3-2A-04, required a plaintiff to file, early in the litigation process, a certificate of qualified expert and accompanying report

arbitration scheme not to take effect until 1978 when this Court ultimately held that the Act was constitutional.  *Attorney General v. Johnson*, 282 Md. 274, 313–14 (1978), *appeal dismissed*, 439 U.S. 805 (1978).  As this Court noted in *Witte v. Azarian*, "[t]he arbitration scheme was essentially placed 'on ice' for about two years while challenges to its legality worked their way through the courts."  369 Md. 518, 528 (2002).

[4] In 1983, the General Assembly adopted a Senate Joint Resolution declaring that the cost of medical liability insurance had "increased ten-fold" since 1975 and requesting that the Governor appoint a commission to study the issue.  *Breslin v. Powell*, 421 Md. 266, 281 (2011); S.J. Res. 14, 1983 Md. Laws, J. Res. 9.  "In 1984, Senate Bill 16 presented several recommended changes to tort doctrines and the manner in which malpractice claims were processed."  *Breslin*, 421 Md. at 281.  Among its proposed changes, the Bill included a requirement for a "certificate of a qualified expert attesting to a departure from the standard of care or informed consent," to be filed within 90 days of the filing of the claim, and that the "qualified expert" selected may not receive more than 50% of his or her income from testifying in malpractice cases.  *Id*. (citation modified).  As we explained in *Breslin*,

> Although the Bill did not pass, its demise spawned, like a mushroom from decay, the creation of a task force whose purpose was to investigate trends in medical malpractice claims.  In December 1985, the task force reported to the General Assembly that, since 1984, medical malpractice liability insurance premiums increased, depending on the medical specialty and hospital involved, between [30] and 250 percent.

*Id.* at 281–82 (citation omitted).

attesting to a breach in the standard of care that proximately caused the alleged injuries in any case in which informed consent was not the sole issue or in which liability was not conceded.[5]  As we explained in *Debbas*, the certificate requirement "was intended to eliminate excessive damages and reduce the frequency of claims" and "consistently has been considered as serving a gatekeeping function."  389 Md. at 378 (citing Report of the Joint Executive/Legislative Task Force in Medical Malpractice Insurance, at 27 & 30 (Dec. 1985)).[6]

As the Appellate Court aptly observed,

Perhaps more than the health claims arbitration process itself, the certificate requirement advanced the purpose of weeding out non-meritorious claims. In virtually all non-informed consent medical malpractice claims, a plaintiff's proof that the defendant breached the standard of care must be adduced through the testimony of an expert witness.  The only exceptions are those extraordinarily rare medical malpractice cases in which the defendant's act or omission is such that ordinary lay people would be able to determine that the act or omission was a breach of the standard of care, such as amputating the wrong leg.  Thus, requiring an initial attestation by an expert witness in support of the elements of liability in a medical malpractice case

---

[5] As enacted in 1986, § 3-2A-04 of the Courts and Judicial Proceedings ("CJ") Article provided in pertinent part:

(b) Unless the sole issue in the claim is lack of informed consent:

(1) A claim filed after July 1, 1986, shall be dismissed, without prejudice, if the claimant fails to file a certificate of a qualified expert with the Director attesting to departure from the standards of care, and that the departure from standards of care is the proximate cause of the alleged injury, within 90 days from the date of the complaint.

1986 Md. Laws, Ch. 640.

[6] During the General Assembly's 1995 session, the General Assembly enacted another major change to the Act by allowing either party to waive the entire arbitration process.  1995 Md. Laws, Ch. 582, codified as CJ § 3-2A-06B.

16

(breach in the standard of care *and causation of injury*) eliminated at an early stage cases that would never be meritorious. Likewise, liability could be imposed against the defendant if at that initial stage the defendant could not produce a certificate of qualified expert defending the defendant's treatment of the plaintiff. The effectiveness of the certificate requirement eclipsed the effectiveness of the arbitration process, and led to amendments to the Act that permitted waiver of arbitration, so long as the parties filed appropriate certificates.

*DeMuth*, 205 Md. App. at 539 (citation modified) (emphasis added).

With this statutory history in mind, including the General Assembly's purpose of weeding out non-meritorious claims, I turn to the text of the statute.

### B. The Text of the Act

The Health Care Malpractice Claims Act is set forth at CJ § 3-2A-01 *et seq.* The Act, in general, governs procedures for all "claims, suits, and actions . . . by a person against a health care provider[7] for medical injury[8] allegedly suffered by the person in which damages of more than the limit of the concurrent jurisdiction of the District Court are sought[.]" CJ § 3-2A-02(a)(1). To initiate a claim under the Act, a person with a medical

---

[7] The Act defines "[h]ealth care provider" as

[A] hospital, a related institution as defined in § 19-301 of the Health – General Article, a medical day care center, a hospice care program, an assisted living program, a freestanding ambulatory care facility as defined in § 19-3B-01 of the Health – General Article, a physician, a physician assistant, an osteopath, an optometrist, a chiropractor, a registered or licensed practical nurse, a dentist, a podiatrist, a psychologist, a licensed certified social worker-clinical, and a physical therapist, licensed or authorized to provide one or more health care services in Maryland.

CJ § 3-2A-01(f)(1) (2020 Repl. Vol., 2024 Suppl.).

[8] The Act defines "[m]edical injury" as an "injury arising or resulting from the rendering or failure to render health care." CJ § 3-2A-01(g).

17

malpractice claim must first file that claim with the Director of the Health Care Alternative Dispute Resolution Office ("HCADRO"). *Id.* § 3-2A-04(a); *Walzer v. Osborne*, 395 Md. 563, 575 (2006).

Within 90 days after filing a claim with the HCADRO, the plaintiff must file a "certificate of qualified expert . . . attesting to departure from standards of care, *and that the departure from standards of care is the proximate cause of the alleged injury*[.]" CJ § 3-2A-04(b)(1)(i)1. (emphasis added).

CJ § 3-2A-02(c)(1) provides, in pertinent part, that a health care provider "is not liable for the payment of damages unless it is established that the care given by the health care provider is not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action."

CJ § 3-2A-02(c)(2)(ii) provides, in pertinent part, that "a health care provider who attests in a certificate of a qualified expert or testifies in relation to a proceeding before a panel or court concerning a defendant's compliance with or departure from standards of care" must "have had clinical experience, provided consultation relating to clinical practice, or taught medicine in the defendant's specialty or a related field of health care, or in the field of health care in which the defendant provided care or treatment to the plaintiff, within 5 years of the date of the alleged act or omission giving rise to the cause of action[.]"

If a plaintiff fails to file an expert's certificate, the Act mandates dismissal without prejudice "unless the plaintiff obtains one of three statutory extensions of the time to file

18

an expert's certificate[.]" *Walzer*, 395 Md. at 575–76 (quoting *Edward W. McCready Mem'l Hosp. v. Hauser*, 330 Md. 497, 501 (1993) (citing CJ § 3-2A-04(b)(5), § 3-2A-05(j) and § 3-2A-04(b)(1)(ii))).[9]  In addition to filing a certificate of a qualified expert, the Act also requires that the plaintiff or claimant file an attesting expert report.  CJ § 3-2A-04(b)(3)(i).

After filing the certificate or certificates, the plaintiff can waive arbitration and file suit in the circuit court.  *Id.* § 3-2A-06B(b)(1).

---

[9] Two statutory provisions involve an extension based on "good cause."  CJ § 3-2A-04(b)(5) states that "[a]n extension of the time allowed for filing a certificate of a qualified expert under this subsection shall be granted for good cause shown."  CJ § 3-02A-05(j) provides: "Except for time limitations pertaining to the filing of a claim or response, the Director or the panel chairman, for good cause shown, may lengthen or shorten the time limitations prescribed in subsections (b) and (g) of this section and § 3-2A-04 of this subtitle."  The third exception is set forth in CJ § 3-2A-04(b), which states, in pertinent part:

(1)(i)1. Except as provided in item (ii) of this paragraph, a claim or action filed after July 1, 1986, shall be dismissed, without prejudice, if the claimant or plaintiff fails to file a certificate of a qualified expert with the Director attesting to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury, within 90 days from the date of the complaint;

\* \* \* \*

(ii) In lieu of dismissing the claim or action, the panel chairman or the court shall grant an extension of no more than 90 days for filing the certificate required by this paragraph, if:

1. The limitations period applicable to the claim or action has expired; and

2. The failure to file the certificate was neither willful nor the result of gross negligence.

19

### C. Some Case Law Discussing the Certificate Requirements Under the Act

This Court and the Appellate Court have discussed the certificate and report requirements in several opinions. The plaintiff's certificate(s) "at a minimum, must *identify with specificity*, the defendant(s) (licensed professional(s)) against whom the claims are brought, include a statement that the defendant(s) breached the applicable standard of care, and that such a departure from the standard of care was the proximate cause of the plaintiff's injuries." *Carroll*, 400 Md. at 172 (emphasis added); *see also D'Angelo v. St. Agnes Healthcare, Inc.*, 157 Md. App. 631, 652 (2004) (affirming the circuit court's dismissal of a complaint as to all defendants where the plaintiff's certificates failed to identify which of the named defendants breached the applicable standard of care).

In *Carroll*, the plaintiff underwent a mastectomy after which a catheter was inserted in her chest for the administration of chemotherapy. 400 Md. at 172–73. The catheter was to be removed two months after she completed chemotherapy. *Id.* at 173. It was not removed until nearly a year after that, and, as a result, the plaintiff developed deep vein thrombosis and chronic venous stasis. *Id.*

The plaintiff brought a medical malpractice suit against her oncologist and the surgeon who inserted the catheter, alleging that they "fail[ed] to communicate the need to have the catheter removed in a timely manner." *Id.* Her physician's certificate referenced five health care providers, including the two named defendants and two unidentified physicians, and stated generally that "there was no clear communication to the patient." *Id.* at 196–97 (citation modified). The circuit court dismissed the action for failure to file

20

a proper certificate of qualified expert. *Id.* at 171. This Court affirmed. *Id.* at 172. We held that the certificate was deficient because it "failed to state with sufficient specificity which physician or physicians breached the standard of care and which physician or physicians were allegedly responsible for [the plaintiff's] injuries." *Id*. at 197. We also observed that the certificate "failed to state what the standard of care was or *how* [the defendants] departed from it." *Id.* We explained:

> Maryland law requires that the certificate mention explicitly the name of the licensed professional who allegedly breached the standard of care. We believe that this requirement is consistent with the General Assembly's intent to avoid non-meritorious claims. Moreover, it is reasonable because the certificate would be rendered useless without an identification of the allegedly negligent parties. When a certificate does not identify, with some specificity, the person whose actions should be evaluated, it would be impossible for the opposing party, the HCADRO, and the courts to evaluate whether a physician, or a particular physician out of several, breached the standard of care.

*Id.* at 196 (citation modified).

In *Kearney v. Berger*, we held that a certificate of qualified expert is deficient when it "fails to state the applicable standard of care and how the defendant allegedly departed from that standard of care[.]" 416 Md. 628, 649–50 (2010). In that case, the plaintiffs sued a physician for failing to perform a timely biopsy of a mole, which turned out to be a melanoma. *Id.* at 633. The complaint was accompanied by a certificate that stated, in relevant part, "it is my opinion that the care rendered fell below the standards of care applicable to the treatment of [the deceased plaintiff] . . . and such deviation from the standards was the proximate cause of injury and damage to [the deceased plaintiff] [.]" *Id.* at 634 (citation modified). No report was filed. *Id.* at 635.

21

We concluded that the certificate was defective not only because it lacked a report, but also because it did not include essential information:

> [The] certificate d[id] not explain what the standard of care was, what [the physician] should have done to satisfy that standard of care, or include any details at all about what happened when [the physician] allegedly violated the standard of care. Without this information, [the plaintiffs'] certificate could not be used to evaluate whether [the physician] violated the standard of care and is therefore deficient.

*Id.* at 650. We held that dismissal of the case was required under CJ § 3-2A-04(b) because the certificate was deficient. *Id.* at 668–69.

In *Dunham v. University of Maryland Medical Center*, the plaintiffs filed a medical malpractice claim against several medical centers alleging medical negligence relating to the development and progression of pressure ulcers. 237 Md. App. 628, 635 (2018). The plaintiffs' certificate set forth, in pertinent part, that the medical centers, "through their agents, servants, and/or employees, breached the applicable standard of care[.]" *Id.* at 636. Notably, the certificate "did not identify the specific agents, servants, or employees whose care was at issue." *Id.* at 636. The medical centers moved to strike the certificate, and the circuit court ruled that the certificate was deficient for failing to identify the specific licensed healthcare providers who violated the standard of care. *Id.* at 637, 639–40.

On appeal, the plaintiffs argued that "Maryland law does not require naming specific health care providers in a [certificate] for agency purposes when institutional defendants are properly named." *Id.* at 651. Specifically, the plaintiffs asserted that because "the people usually responsible for the injuries that [the plaintiff] suffered are nurses[,]" this Court's decision in *Carroll* had no application because that case "did not

22

involve any institutional defendants and did not involve any claims of vicarious liability."

*Id.* at 650 (emphasis omitted). The Appellate Court stated that, "although the issue of direct corporate liability of a hospital is an interesting and novel one, the complaint, certificate, and report here all alleged that [the institutional defendants] breached their standard of care through the actions or inactions of their agents, servants, and employees." *Id.* at 651. The Appellate Court determined that the novel issue of whether an entity can be liable for medical malpractice separate and apart from a theory of *respondeat superior* was not properly before the court. *Id.* The Appellate Court rejected the plaintiffs' argument that a certificate is not required to identify specific health care providers when "institutional defendants are properly named." *Id.* at 651–53. The court explained that "Maryland appellate cases . . . have made clear that a certificate must 'mention explicitly the name of the licensed professional who allegedly breached the standard of care.'" *Id.* at 651 (quoting *Carroll*, 400 Md. at 196). Reviewing the plaintiffs' certificate, the Appellate Court noted,

> Here, the certificate filed with the statement of claim . . . stated that [the medical centers], acting through their agents, servants, or employees, breached the standard of care, but it did not specifically identify any individuals who breached the standard of care. Without more detail regarding the licensed professionals who allegedly breached the standard of care, thereby making [the medical centers] vicariously liable, the certificate did not contain the 'information necessary for evaluating whether the defendant breached the standard of care.'

*Id.* at 652 (quoting *Kearney*, 416 Md. at 651). Nurse Jones-Singh's certificate suffers from the same fatal flaws as the certificates in *Carroll* and *Dunham*. To be sure, Canton Harbor did not assert these deficiencies before the trial court—instead choosing to put all of its

23

eggs in the "medical causation" basket. Perhaps if it had asserted other deficiencies, we would not be here. That said, we review the sufficiency of Nurse Jones-Singh's certificate de novo and "will affirm the circuit court's judgment 'on any ground adequately shown by the record, even one upon which the circuit court has not relied or one that the parties have not raised.'" *Sheppard Pratt Health Sys.*, 465 Md. at 350 (quoting *Sutton*, 226 Md. App. at 74). Therefore, I would affirm the circuit court's judgment on this basis.

Putting aside the deficiencies that were not raised at the circuit court, I turn to the one that was raised and reach the same conclusion—the certificate is insufficient as a matter of law.

### D. The Act Requires a Certificate Attesting to Medical Causation by a Physician Where Proximate Cause Involves a Medical Diagnosis

There is no dispute that Nurse Jones-Singh is a "health care provider" under CJ § 3-2A-01(f)(1) and is qualified to attest to the breach of the standard of care for nurses. The issue is whether a registered nurse is a "qualified expert" who can attest "that the departure from standards of care is the proximate cause of the alleged injury" as required by CJ § 3-2A-04(b)(1)(i). In my view, the plain text does not resolve the issue, and it is therefore ambiguous.[10] Thus, I would "look for other clues—e.g., the construction of the statute, the relation of the statute to other laws in a legislative scheme, the legislative history, and the general purpose and intent of the statute." *Breslin*, 421 Md. at 287.

---

[10] I agree with the statutory analysis undertaken by my colleagues on the Appellate Court in *Gore v. Calvert Memorial Hospital of Calvert County*, No. 1703, 2020 WL 2731226, at *5–8 (Md. App. Ct. May 26, 2020). My analysis here substantially tracks the opinion of that court.

Maryland Rule 5-702 governs admissible expert testimony in trials.  It states:

> Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue.  In making that determination, the court shall determine (1) *whether the witness is qualified as an expert by knowledge, skill, experience, training, or education,* (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

(Emphasis added).

Section 14-101(m) of the Health Occupations ("HO") Article (2021 Repl. Vol.) defines "[p]hysician" as "an individual who practices medicine."  "Practice medicine" "means to engage with or without compensation in medical: (i) *Diagnosis;* (ii) Healing; (iii) Treatment; or (iv) Surgery."  HO § 14-101(o)(1) (emphasis added).  "Practice medicine" "includes doing, undertaking, professing to do, and attempting any of the following: (i) *Diagnosing*, healing, treating, preventing, prescribing for, or removing *any physical, mental, or emotional ailment* or supposed ailment of an individual[.]"  *Id.* § 14-101(o)(2)(i) (emphasis added).

The term "medical diagnosis" is not defined in the Act or regulations.  According to Black's Law Dictionary, "diagnosis" means "[t]he determination of a medical condition (such as a disease) by physical examination or by study of its symptoms."  (11th ed. 2019). Merriam Webster's Dictionary includes in its definition of "diagnosis" the "investigation or analysis of the cause or nature of a condition, situation, or problem" and "a statement or conclusion from such an analysis."  *Diagnosis*, Merriam-Webster's Online Dictionary, https://perma.cc/Y57Q-VKE4.  Thus, using the plain meaning of the term "diagnosis," I conclude that "medical diagnosis," as that term is used in the definition of "practice

25

medicine" under HO § 14-101(o), means the determination of a medical condition, as well as the cause or nature of such condition.

By contrast, under HO § 8-101(o)(1), "[p]ractice registered nursing" means:

[T]he performance of acts requiring substantial specialized knowledge, judgment, and skill based on the biological, physiological, behavioral, or sociological sciences as the basis for assessment, *nursing diagnosis*, planning, implementation, and evaluation of the practice of nursing in order to: (i) Maintain health; (ii) Prevent illness; or (iii) Care for or rehabilitate the ill, injured, or infirm.

(Emphasis added). "Nursing diagnosis" is defined as "*a description* of the actual or potential, overt or covert health problems which registered nurses are licensed to treat." Code of Maryland Regulations ("COMAR") 10.27.09.01.B(16) (emphasis added).

By using the term "medical diagnosis" in its definition of "practice medicine" and "nursing diagnosis" in its definition of "practice registered nursing," the General Assembly clearly indicated that registered nurses in Maryland are not permitted to make a medical diagnosis; they are permitted only to describe a health problem that they are licensed to treat. Moreover, a registered nurse cannot provide expert medical causation testimony because the expert's opinion as to whether the tortfeasor's actions caused the medical condition necessarily involves a medical diagnosis of said condition. *See Frausto v. Yakima HMA, LLC*, 393 P.3d 776, 777 (Wash. 2017) ("The ability to independently diagnose and prescribe treatment for a particular malady is strong evidence that the expert might be qualified to discuss the cause of that same malady."); *Vaughn v. Miss. Baptist Med. Ctr.*, 20 So. 3d 645, 652 (Miss. 2009) ("The majority rule [is] that nursing experts cannot opine as to medical causation and are unable to establish the

26

necessary element of proximate cause." (citation modified)); *Richardson v. Methodist Hosp. of Hattiesburg, Inc.*, 807 So.2d 1244, 1248 (Miss. 2002) (holding that a nurse "lack[ed] the requisite education and experience as an expert to testify concerning the causal link between [the patient's] death and the alleged deviations in nursing care"); *Richberger v. West Clinic, P.C.*, 152 S.W.3d 505, 509 (Tenn. Ct. App. 2004) ("[A] registered nurse is prohibited from making a medical diagnosis [pursuant to the state statute outlining the scope of a nurse's duties] and is therefor not competent to offer opinions on medical causation in a medical malpractice action."); *Costello v. Christus Santa Rose Health Care Corp.*, 141 S.W.3d 245, 248–49 (Tex. App. 2002) (holding that because a licensed registered nurse is expressly prohibited by Texas law from rendering a medical diagnosis, the nurse also lacks the expertise to testify on subjects that require a medical diagnosis); *State v. One Marlin Rifle*, 725 A.2d 144, 148–49 (N.J. Super. Ct. App. Div. 1999) (holding that, because New Jersey law did not allow a nurse to make a medical diagnosis, "opinion testimony regarding the specific identity and cause of [a patient's] mental condition would clearly have constituted a medical diagnosis" and was therefore inadmissible); *Long v. Methodist Hosp. of Indiana, Inc.*, 699 N.E.2d 1164, 1169 (Ind. Ct. App. 1998) ("[W]e now hold that nurses are not qualified to offer expert testimony as to the medical cause of injuries."); *Kent v. Pioneer Valley Hosp.*, 930 P.2d 904, 907 (Utah Ct. App. 1997) (holding that a nurse's "affidavit [did] not provide the requisite foundation to qualify her as an expert capable of testifying as to the proximate cause of plaintiff's alleged nerve damage").

As previously noted, CJ § 3-2A-04(b)(1)(i) requires that the certificate attest "that the departure from standards of care is the proximate cause of the alleged injury[.]" Because registered nurses cannot testify as to medical causation, it follows that they cannot sign certificates as qualified experts where proximate cause involves medical causation—which, in my view, will be in all but the very rare cases.

To adopt an interpretation of the Act that permits a registered nurse to sign a certificate and report simply because he or she is a "health care provider" and a "health care provider" can sign a certificate would defeat the purpose of the Act. The General Assembly "enacted [the Act] for purposes of weeding out non-meritorious claims and to reduce the costs of litigation." *Walzer*, 395 Md. at 582. If a registered nurse is able to sign a certificate which would require an attestation of medical causation, he or she would be providing an opinion as a qualified expert that is outside the scope of the practice of registered nursing, which does not allow registered nurses to make medical diagnoses. *See* HO §§ 8-101(o) & 14-101(o). As a result, certificates could be filed where there is no competent evidence of medical causation, thus allowing non-meritorious medical malpractice claims to be litigated. This is also an illogical interpretation given the General Assembly's purpose behind the Act. If a medical malpractice claim requires expert testimony to establish a violation of the standard of care and medical causation—which is *all* cases except the very rare ones—it would be illogical to interpret the certificate requirement as permitting a plaintiff to file an attestation that only satisfies *one-half* of the matters for which expert testimony is required.

28

In my view, the better interpretation of the certificate requirements under the Act is that a nurse, as a "health care provider" under CJ § 3-2A-01(f)(1), is qualified to attest to the breach of the standard of care for nurses. However, a nurse is not a "qualified expert" who can attest "that the departure from standards of care is the proximate cause of the alleged injury," as required by CJ § 3-2A-04(b)(1)(i), where the causation opinion requires or involves a medical diagnosis. This interpretation is logical and consistent with the General Assembly's purpose in enacting the Act and the certificate requirement.

I note that the same result was reached in *Esquivel v. El Paso Healthcare Systems, Ltd.*, 225 S.W.3d 83, 90 (Tex. App. 2005). In that case, the Texas Court of Appeals addressed the issue of whether a nurse can sign a preliminary expert report. *Id.* at 88. Similar to Maryland's statute, the Texas statute at the time required that "plaintiffs must, within 180 days of filing their claim, provide each defendant physician and health-care provider an expert report with the expert's *curriculum vitae* or they must voluntarily nonsuit the action." *Id.* The statute also mandated that the expert report contain "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* at 88–89 (citation modified).

The plaintiffs in *Esquivel I* had Dr. Mary Helen M. Castillo, a registered nurse and doctor of education, sign an expert report stating that the defendant hospitals "failed to use proper care to assure that [the patient] received the basic nursing care she needed and both nursing staffs failed to observe and document skin integrity and breakdown of tissue which

29

contributed to skin deterioration and formation of decubitus ulcers." *Id.* at 86–87. The defendant hospitals moved to dismiss the case because Dr. Castillo "was not qualified to render a medical diagnosis, and therefore, she was not qualified to render an expert opinion as to the cause of Stage IV decubitus ulcers." *Id.* at 87. The trial court granted the motions to dismiss. *Id.* The plaintiffs appealed, and the Texas Court of Appeals noted that as a nursing expert, Dr. Castillo "could testify regarding the nursing standard of care and how that standard was breached[,]" because that was within her experience and training. *Id.* at 90. The Court, however, held that nurses are "prohibited from making a medical diagnosis or prescribing corrective or therapeutic treatment" because the relevant statute "does not include acts of medical diagnosis or prescribing therapeutic or corrective measures." *Id.* Therefore, the Court held that the trial court did not abuse its discretion in determining that Dr. Castillo was not qualified to provide an expert opinion on causation in the expert report. *Id.* at 91.

V

**Nurse Jones-Singh's Attestation on Proximate Cause Is Insufficient<br>as a Matter of Law**

### A. There Is No Evidence in this Record that Diagnosing the Cause of Pressure Ulcers is Within a Nursing Diagnosis

I respectfully disagree with the Plurality's conclusion that Nurse Jones-Singh's causation opinion did not involve a medical diagnosis for the following reasons. First, as I noted above, the certificate and report do not identify any particular individuals who are alleged to have violated the standard of care—other than one physician—or how any particular health care provider proximately caused Mr. Robinson's medical injury. The

30

Plurality asserts that "where a patient has previously been diagnosed with a particular medical injury by another health care provider, a registered nurse who relies on that pre-existing diagnosis does not make a diagnosis concerning the injury itself in a certificate filed under the Act." Plurality Slip Op. at 23. In my view, the certificate and report are deficient because they lack the required specificity. The Plurality's analysis seemingly embraces the deficiencies by concluding that Nurse Jones-Singh is not making a medical diagnosis because she asserts that an unspecified individual or individuals—who may or may not be qualified to make such a diagnosis—said so in a medical record.

Next, the Plurality describes the standards of care for registered nurses in the COMAR regulations and concludes that the "regulations highlight the complexity of modern nursing – a practice that extends far beyond a mere 'description' of health problems." *Id.* at 26. I certainly agree with that sentiment. Indeed, nurses, as health care providers, play a critical role in patient treatment and care.

The Plurality states that:

The practice of registered nursing requires *identifying* and collecting data in a comprehensive and ongoing manner, *analyzing* such data to create a nursing diagnosis that identifies the nature and extent of the client's health status, identifying expected outcomes, *developing a plan of care* that *prescribes interventions* to attain expected outcomes, *implementing the interventions*, and *evaluating the client's progress* toward attainment of those outcomes.

*Id.* As the Plurality correctly observes, "federal Medicare and Medicaid regulations applicable to skilled nursing and other long-term care facilities require such facilities, consistent with professional standards of practice, *to prevent pressure ulcers unless they are unavoidable*, and to treat existing pressure ulcers." *Id.* (citing 42 C.F.R. § 483.25(b))

31

(emphasis added).  The Plurality points out that "federal regulations classify '*[t]reatment of extensive decubitus ulcers or other widespread skin disorder*' as skilled nursing services."  *Id.* at 26–27 (quoting 42 C.F.R. § 409.33(b)(6)) (emphasis added).   The Plurality also points out that: "A Maryland statute governing quality assurance programs in nursing homes similarly identifies '*prevention* of decubitus ulcers' as 'nursing care.'" *Id.* at 27 (quoting Md. Code Ann., Health-Gen. § 19-1410(b)(5)(ii)).  I agree with all of the above statements made by the Plurality.  I also agree with the Plurality that "prevention[] and treatment of pressure ulcers fall comfortably within the scope of nursing care – especially in the context of skilled nursing facilities."  *Id.*  The Plurality includes "identification" in that list, and, as I describe below, clinicians appear to disagree on that last point.

Putting the "identification" conclusion aside, I part ways with the Plurality when it makes what I consider to be the ultimate quantum leap—concluding that a registered nurse may attest to proximate causation in a certificate "where a nursing diagnosis is explicitly or implicitly claimed to suffice to opine concerning the proximate cause of a pressure ulcer[.]" *Id.* at 27–28.  According to the Plurality, the issue of whether identifying the proximate cause of a pressure ulcer is within the proper scope of rendering a nursing diagnosis is "at least an open question." *Id.* at 27.  To support its position, the Majority cites to the Appellate Court's opinion. *Robinson*, 261 Md. App. at 587.  The sole basis for its conclusion that a registered nurse is qualified to render an opinion on the *proximate cause* of a pressure ulcer is because the Appellate Court said so, and because Nurse Jones-

32

Singh says so in her certificate. Because the Plurality does not engage in any further analysis on this issue, I turn to the Appellate Court's analysis and why I disagree.

In its opinion, the Appellate Court cited a 2010 article[11] in which the American Nursing Association ("ANA") responded to questions from nursing professionals seeking clarification as to whether it was outside the scope of nursing practice for nurses to "stage" a patient's existing pressure injuries upon admission. Courtney H. Lyder, Diane L. Krasner & Elizabeth A. Ayello, *Clarification from the American Nurses Association on the Nurse's Role in Pressure Ulcer Staging*, 23 Advances in Skin & Wound Care 8, 8–10 (2010). The ANA advised that it was within the scope of nursing practice for registered nurses to "record[] their assessments, diagnoses, outcomes, and plans for the newly admitted patient[,]" including their assessment of skin integrity, which would "vary depending on their educational preparation and experience, with the wound, ostomy, continence nurse being the expert." *Id.* at 10. This assessment enables the nurses to determine nursing care needs and develop a plan of care. *Id.* "However, nurses are not writing ICD codes on behalf of the admitting provider who has completed and reported his/her own assessment." *Id.* As such, registered nurses "would not be practicing outside their scope of practice if the nurse *identifies* the alteration in skin integrity as a pressure ulcer and stages it before the admitting provider." *Id.* (emphasis added).

In 2022, the same journal published an article recounting a study finding a 54% difference in diagnosis of pressure injuries between registered nurses and wound experts

---

[11] Canton Harbor asserts that this article was not part of the record below.

and noting concerns that the nurses identified other conditions (including incontinence associated dermatitis) as pressure injuries. Mary R. Brennan, *Who Should Assess and Stage Pressure Injuries in Hospitalized Patients?*, 35 Advances in Skin & Wound Care 473, 474 (2022). Multiple responses to this article affirmed the concern, recommending that a nurse notify a specialist upon identifying a possible pressure injury. Michael A. Bain, Garrett Wirth & Robert X. Murphy Jr., *Responses to "Who Should Assess and Stage Pressure Injuries in Hospitalized Patients?"*, 36 Advances in Skin & Wound Care 120, 122 (2023). These responses called this question the "elephant in the room," stating that it was "time for the ANA to reconsider its 2010 position on [registered nurses] staging of" pressure injuries because "[t]imes and circumstances change" and "[s]taging [pressure injuries] is complicated":

> We now know much more about [pressure injuries] than we did in 2010. Staging [pressure injuries] is complicated. It requires an in-depth understanding of anatomy and physiology; the pathophysiology of [pressure injuries]; the role of physics in mechanical injury; and the ability to synthesize data from other disciplines such as nutrition, medicine, social work, and physical and occupational therapies. Critical thinking is needed to apply the situational facts when evaluating the patient. The healthcare professional assessing the wound must be certain that it is a [pressure injury] and not some other type of wound. Nurse[s] do not provide a medical diagnosis. If there is any uncertainty about the wound etiology or diagnosis, nurses should consult a qualified healthcare provider for a wound diagnosis. Getting this step wrong has major implications for patient care and outcomes.

*Id.*

Notably, this scholarly debate is over *the proper application of the nursing diagnosis* of pressure injury, which involves only *identifying* a wound as a pressure injury (or potential pressure injury) to allow the nurse to implement measures to relieve or heal that injury within

the scope of nursing practice. Mary Beth Flynn Makic & Marina Reyna Martinez-Kratz, *Ackley and Ladwig's Nursing Diagnosis Handbook: An Evidence-Based Guide to Planning Care* 765 (13th ed. 2022) (describing nursing interventions). A nursing diagnosis of pressure injury *does not* include undertaking a differential diagnosis of the medical cause of the pressure injury or ascertaining whether it was "avoidable" or "unavoidable" after a full consideration of the patient's comorbidities and other risk factors.

Indeed, a recent article in the Journal of the American Medical Association ("JAMA") reflects a growing awareness among clinicians that "pressure ulcers" may not be caused simply by external "pressure" when skin breaks down in debilitated individuals and critically ill patients, and instead involves medical diagnoses that can span many different medical disciplines. *See* Dan R. Berlowitz & Jeffrey M. Levine, *The Evolving Case for Skin Failure—Beyond Pressure Injury*, JAMA Internal Med., Jan. 13, 2025, at E1. As Drs. Berlowitz and Levine note, pressure ulcers may be labeled as such "without consideration as to their etiology and whether they truly are related to pressure." Drs. Berlowitz and Levine explain that:

> [I]t is increasingly debated as to whether this label is indeed true, or whether some of these "pressure injuries" may be due in large part to other, nonpressure factors. This debate has important implications for nomenclature, clinical practice, quality measurement, risk management, and reimbursements. *The failure to acknowledge that "skin failure" may not primarily be due to pressure disregards the contribution of pathophysiology and results in an inability to appropriately diagnose and create quality metrics.*
>
> There is a growing consensus that skin, like other organ systems, can fail in the setting of acute, life-threatening comorbidities and during the dying process.

35

*Id.* (emphasis added). Some clinicians have concluded that skin can undergo "involutional changes" when bodily functions shut down as death approaches, and that "[s]imilar changes may take place in other clinical scenarios involving critical medical illnesses." *Id.* "In these scenarios, factors related to aging, multiple comorbidities, and physiologic stressors can directly cause skin breakdown." *Id.* According to Drs. Berlowitz and Levine:

> [S]kin failure and pressure injury may be viewed on a continuum, with pressure being just one of many multifactorial contributors, along with others, including malnutrition, multimorbidity, neurologic injury, immobility, frailty, sarcopenia, dementia, and critical or terminal illness. There is currently no *International Classification of Diseases (ICD)* code for skin failure. Thus, there is no way to appropriately classify the development of a necrotic wound in a pressure area of a nursing home resident in a trajectory toward death, or a full-thickness skin injury in a critically ill patient in intensive care.

> \* \* \* \*

> [I]t can be postulated that skin failure represents a state of extreme tissue intolerance in which trivial amounts, or even no pressure, is needed for cell death. Ischemia may be critical, along with factors such as inflammation, vascular permeability, and hypoperfusion.

> \* \* \* \*

> [T]here is no agreement on a common definition of skin failure. We consider skin failure as a state in which tissue tolerance is so compromised that cells can no longer survive in zones of physiological impairment. *Factors contributing to this impairment may include hypoxia, local mechanical stresses, impaired nutrient delivery, and buildup of toxic metabolic byproducts.* This definition does not clearly state whether some pressure-induced cellular deformation is ultimately required to cause skin ulceration ([i.e.], pressure injury) or the ulceration may arise in the absence of any substantial pressure ([i.e.], skin failure).

*Id*. at E1–E2 (footnote omitted) (emphasis added). "[C]linicians are still debating the etiology of wounds developing in aging and critically ill patients." *Id.* at E2. Drs.

36

Berlowitz and Levine opine that future research is necessary to determine whether skin failure "may directly manifest in ulceration in the absence of external mechanical forces," and that research "must be geared toward analyzing factors leading to failure of skin as an organ and defining of diagnostic markers[,]" including an "interdisciplinary assessment that incorporates medical history, functional status, physiologic and pharmacologic considerations, and prognosis." *Id.* As this peer-reviewed medical journal article reflects, diagnosing the *cause* or factors contributing to a "pressure ulcer" is the subject of significant clinical debate.

At bottom, the Plurality's conclusion—which is based entirely on the Appellate Court's conclusion—is that a registered nurse is qualified to attest to the proximate cause of a pressure ulcer because it does not involve a medical diagnosis. The Appellate Court concluded as such based upon its review of medical literature. What my discussion about other—and more recent—peer-reviewed medical articles should make clear is that neither the Appellate Court nor this Court should be making a determination that the *cause* of a pressure ulcer does not involve a medical diagnosis, and, therefore, a registered nurse is permitted to attest to the proximate on this issue. Nor should we simply say that is an issue for a *Rochkind-Daubert* hearing down the road. The General Assembly has imposed certain statutory conditions that must be satisfied at the certificate level. It is not our job to disregard them. If there is "an open question" as to "whether *identifying the proximate cause* of a pressure ulcer is within the proper scope of rendering a nursing diagnosis" and, therefore, "does not constitute or require making a medical diagnosis" as this Court and the Appellate Court have concluded, at the very least, such a determination should be made

37

at an evidentiary hearing at the circuit court, and not as a legal conclusion by an appellate court.

### B. *Nurse Jones-Singh's Certificate Presents* Ipse Dixit *Opinions on Medical Causation That She is Not Qualified to Render*

Even if Nurse Jones-Singh was qualified to offer an opinion on proximate cause here, I would determine that the certificate is insufficient as a matter of law. As I noted above, Nurse Jones-Singh concluded that the only possible cause—and thus the only proximate cause—of Mr. Robinson's deepening skin injury was negligence by Canton Harbor. The entirety of her causation opinion was that Mr. Robinson's injury is "only caused by friction and/or shearing. Therefore [Canton Harbor] directly caused the [injury] to the sacrum noted on Mr. Robinson *as there is no other etiology for this type of wound*." As discussed above, Nurse Jones-Singh observed that Mr. Robinson had several cardiovascular-related comorbidities and an extensive history of impaired circulation and was immobile with impaired tissue perfusion. Notably, her opinion does not mention how these issues or Mr. Robinson's other medical conditions or medications could have affected the development of the pressure injuries. She renders a classic *ipse dixit* medical opinion about the proximate cause of a significant medical injury without offering any medical justification in support. For this reason, her certificate is insufficient as a matter of law, and I would affirm the judgment of the circuit court dismissing Plaintiff's complaint on this basis. *See Sheppard Pratt Health Sys.*, 465 Md. at 350.

# VI

## Conclusion

In conclusion, I would reverse the judgment of the Appellate Court. I would hold as follows:

1.       A registered nurse is a "health care provider" under CJ § 3-2A-01(f)(1) and is qualified to attest to the standard of care for nurses. However, a nurse is not a "qualified expert" who can attest that "the departure from [the] standards of care is the proximate cause of the alleged injury," as required by CJ § 3-2A-04(b)(1)(i), where proximate cause involves medical causation—in other words, an opinion regarding the proximate cause of an individual's, injury, illness, or death which involves a medical diagnosis. A nurse is qualified to make a nursing diagnosis, not a medical diagnosis. A registered nurse cannot provide medical causation testimony because the nurse's expert opinion as to whether the tortfeasor caused the plaintiff's medical condition necessarily involves a medical diagnosis of said condition. Because registered nurses cannot testify as to medical causation, it follows that they cannot sign a certificate as a qualified expert where proximate cause involves medical causation—which, in my view, will be all but the very rare cases.

2.       In this case, although Nurse Jones-Singh could sign a certificate attesting to the standard of care for nurses, and one that identified nurses who breached the standard of care, I disagree with the Plurality's conclusion that identifying the proximate cause of a pressure ulcer is within the proper scope of rendering a nursing diagnosis and does not constitute or require making a medical diagnosis.

3. Additionally, even if Nurse Jones-Singh was qualified to render medical causation opinions, her certificate is insufficient as a matter of law for two reasons. First, excluding Dr. Shah, Nurse Jones-Singh's certificate does not specifically identify any health care providers by name. Instead, the certificate lumps all of Canton Harbor's staff together and renders several opinions that unnamed physicians breached the physicians' standard of care. Second, the certificate makes a classic *ipse dixit* conclusion that Mr. Robinson's serious medical injury was caused by "friction and shearing," and "there is no other etiology for this type of wound" without offering any medical justification to support her conclusion. I would therefore affirm the circuit court's judgment on both of these bases.

Justice Eaves and Justice Killough have authorized me to state that they join in this concurring and dissenting opinion.